MICHAEL TOMICK *v.* UNITED PARCEL
SERVICE, INC., ET AL.
(AC 32797)

Gruendel, Robinson and Sullivan, Js.

590

Argued January 19—officially released May 22, 2012

*Michael C. Harrington*, with whom were *Genea O. Bell* and, on the brief, *Eric B. Miller*, for the appellants-appellees (defendants).

*Michael D. Colonese*, with whom, on the brief, was *Cassie N. Jameson*, for the appellee-appellant (plaintiff).

*Kathleen Eldergill* and *Marc P. Mercier* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Charles Krich*, principal attorney, and *Jan Elizabeth Walters*, law student intern, filed a brief for the commission on human rights and opportunities as amicus curiae.

*Opinion*

GRUENDEL, J. The defendants, United Parcel Service, Inc., and Kevin Trudelle,[1] appeal from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, Michael Tomick. On appeal, the defendants claim that the court improperly (1) denied their motions to direct and to set aside the verdict with respect to the plaintiff's claims of negligent infliction of emotional distress and violations of General Statutes § 31-51x[2] and General Statutes § 46a-60,[3] (2) denied Trudelle's motion to remit or set aside the verdict against him for negligent infliction of emotional distress, (3) denied the defendants' motion for remittitur as to the jury's awards on the claims of negligent infliction of emotional distress and a violation of § 31-51x, (4) awarded attorney's fees on the plaintiff's claim of negligent infliction of emotional distress, (5) awarded reinstatement and back pay, and (6) precluded evidence of the parties' workers' compensation settlement. In his cross appeal, the plaintiff claims that the court improperly declined to consider the lodestar method when

[1] At all relevant times, Trudelle was the business manager of the Norwich/ Niantic center of United Parcel Service, Inc. For clarity, we refer to United Parcel Service, Inc., individually, as the defendant, to Trudelle by name and to both parties collectively as the defendants.

We note, too, that the commission on human rights and opportunities was named as a defendant, although no counts of the complaint were directed against it. Subsequent to the filing of the appeals in this matter, we granted the commission's application for leave to file an amicus curiae brief.

[2] General Statutes § 31-51x (a) provides in relevant part: "No employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance. . . ."

[3] General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . physical disability . . . ."

calculating the plaintiff's award of attorney's fees. We reverse the court's award of attorney's fees on the plaintiff's claim of negligent infliction of emotional distress. Additionally, we remand the matter of the defendant's motion to direct the verdict as to the plaintiff's claim under § 46a-60.[4] We affirm the judgment in all other respects.

The jury reasonably could have found the following facts. In 1984, the plaintiff was hired by the defendant to sort packages part time. Two years later, he was hired as a package car driver. As a driver, the plaintiff's essential job functions included lifting packages weighing up to seventy pounds and bending, stooping, crouching, squatting, climbing and pivoting for up to nine and one-half hours per day. Under the parties' collective bargaining agreement, drivers bid by seniority for routes. In approximately 1999, the plaintiff bid for a route in Lebanon, where he lived. He was assigned to the defendant's Norwich center (center).

On January 3, 2003, the plaintiff suffered a back injury during the course of his employment. He received a 13 percent permanent disability of his lumbar spine. The plaintiff took a leave of absence until November, 2003, when he returned to work with no restrictions.

On November 30, 2004, the plaintiff reinjured his back when he stepped off a stoop while delivering a package. He sent an electronic message[5] to the center informing the defendant of his situation and completed his route. That evening, Trudelle discussed the injury with

---

[4] We note that the parties also briefed the issues of the court's denial of the defendant's motion to remit the jury's award on count three, the plaintiff's claim under § 46a-60, as well as the court's decision setting aside the award of punitive damages for count three. In light of our order for remand, we need not decide those questions.

[5] The plaintiff used his DIAD system to send these messages. The DIAD system is an electronic clipboard used by drivers that can scan bar codes and send and receive messages.

Michael Hebert, the plaintiff's direct supervisor, and Hebert notified the defendant's insurance carrier of the accident.

The next morning, December 1, the plaintiff was experiencing back pain. He called the center to request the day off to recover. Trudelle approved the absence and instructed the plaintiff to seek medical treatment. The plaintiff was examined at Pequot Medical Center, where he indicated to the treating physician that he needed to be released for full duty because it was the peak season for the defendant's business. The plaintiff told the physician that he would be able to perform his job with a helper,[6] and the physician released the plaintiff for full duty. The plaintiff called Trudelle to inform him that he was released for full duty and requested a helper for the day. Trudelle told the plaintiff that he would have a helper that day, but he did not then take any steps to ensure that the plaintiff would be assigned a helper to his route.

On the morning of December 1, Hebert investigated the scene where the plaintiff had fallen. Hebert e-mailed photographs of the scene to Trudelle, and opined that the plaintiff's account of the accident was untrue and that the injury could be attributed to the plaintiff's carelessness. Trudelle responded to the e-mail, stating, "[g]reat job with this investigation. Do no[t] show [the plaintiff] this but print the write up and pictures and put it in his file."

It was the defendant's standard practice to hold a conference call daily to review any injuries sustained

---

[6] During peak season, the defendant hires seasonal employees called helpers to assist in delivering the increased number of packages. Approximately 65 percent of drivers have helpers to assist on their routes during peak season. Drivers with routes that have between 130 and 170 stops are assigned helpers. In the past, the plaintiff had typically had a helper on his route during the peak season. On December 2, 2004, there were 160 stops on the plaintiff's route.

by employees the previous day. The purpose of these calls was to report the injury, the employee's injury history and the precautions to be taken to ensure that the employee is not hurt again. To prepare for the call, Trudelle obtained the plaintiff's injury history report, a document generated by the defendant's human resources department that reflects injuries an employee has suffered during his or her employment with the defendant. Trudelle made notes on this document before the conference call identifying the injuries that resulted in lost time. Charles A. Sheahan, division manager, and Victor Birch, district risk manager,[7] also participated in the conference call.

On December 2, the plaintiff returned to work. When he arrived that morning, he was told by both the preloader who was loading his truck and Hebert that he was going to have a helper. Because the plaintiff was returning to work after an injury, Hebert accompanied the plaintiff for a portion of his route that morning to evaluate his knowledge of safety methods, as was standard practice.

After completing the training, Hebert instructed the plaintiff to meet a helper at a specified location at noon. The helper was not in the designated meeting location at that time, so the plaintiff contacted the center by electronic message. The plaintiff also called Trudelle to inquire about the helper. Trudelle told the plaintiff that it was the first he had heard that the plaintiff did not have a helper and transferred him to Mark Appleton, a human resources supervisor and the helper coordinator. Appleton was not aware that the plaintiff was supposed to be assigned a helper that day, but began looking for a helper.

---

[7] As district risk manager, Birch was responsible for overseeing the administration by the defendant's insurance carriers of workers' compensation claims.

At that time, the plaintiff called his wife. He told her that he had not been assigned a helper that day and that he was in significant pain. He also told her he would be coming home for lunch, as was typical. The plaintiff then sent several messages to the center to communicate that he was going home for lunch, that he needed to come off the road and that he needed to see a physician. On the way to his home, the plaintiff received a message instructing him to call Trudelle immediately.

When the plaintiff arrived home, he found his wife crying, and she told him that she had called Trudelle. The plaintiff's wife told Trudelle that she thought her husband was being singled out and that she thought he was going to have a nervous breakdown. Trudelle told the plaintiff's wife that the plaintiff was not being honest and that he had gone "above and beyond" to help the plaintiff. The plaintiff called Trudelle from his home, as instructed, and told him that his back was still hurting and that he needed to see a physician. Trudelle told the plaintiff that if he "couldn't do the fucking job, bring the fucking truck back to the building." Trudelle then asked if the plaintiff wanted anybody to come pick up the truck or if the plaintiff could drive it back to the center. The plaintiff said he would bring the truck back after his lunch break.

When the plaintiff returned to the center, he found another driver waiting to take over his route. The plaintiff was upset and in physical pain and went to speak with Trudelle. He asked Trudelle what was going on because he thought he was supposed to have a helper assigned to his route. Trudelle told the plaintiff that his wife had called and said that the plaintiff was having a nervous breakdown. The plaintiff said that he was at his wit's end and needed to see a physician because of his pain. Trudelle told the plaintiff that he was acting irrationally and that he would be sent for a fitness for

duty test and a substance abuse test.[8] The plaintiff was upset by this and told Trudelle that he was going to the medical clinic to be seen by a physician for his back pain. The plaintiff maintained that he would not go for a fitness for duty test, and Trudelle told him that if he did not go he could be fired. At that point, the plaintiff believed that his employment had been terminated.

The plaintiff exited Trudelle's office and left the building yelling and swearing. As he exited, he telephoned his union steward but did not reach him. He then called his wife, who reviewed the collective bargaining agreement and told the plaintiff that refusing a fitness for duty test could be a ground for discharge. Trudelle followed the plaintiff to the parking lot. As the plaintiff reached the lot, supervisor Ray Congdon was walking up the driveway to the lot. Trudelle was on the telephone with Sheahan, describing the situation. Per Sheahan's instructions, Trudelle informed the plaintiff that they would call the state police if he got into his car. Trudelle also told the plaintiff that he needed to accompany him for a fitness for duty test and drug test immediately. When the plaintiff again refused, Trudelle told him he was fired, and it was again the plaintiff's understanding that his employment had been terminated. The plaintiff, while standing approximately ten yards from Trudelle, said, "I should have kicked your ass for what you said to my wife earlier today." Trudelle then told Sheahan over the telephone that the plaintiff said he "might kick [Trudelle's] ass," and the plaintiff corrected him and said, "I didn't say I was going to kick your ass. I said I shoulda." When the plaintiff again refused to accompany Trudelle to the clinic, Congdon suggested,

---

[8] The defendant's drug and alcohol testing handbook states that "[i]n circumstances where there is reasonable suspicion of unauthorized use of drugs or alcohol, [the defendant] will require a covered employee to submit to a fitness-for-duty medical evaluation, which may include drug and alcohol testing." The plaintiff testified that he did not know of any employee who had been sent for such an evaluation that did not include a urinalysis test.

as an attempt to defuse the situation, that the plaintiff go with Congdon to the clinic instead and the plaintiff acquiesced.

The plaintiff was seen at the clinic by Geraldine S. Ruffa, a physician. After examining the plaintiff, she did not find it necessary to administer a urinalysis drug test. The physician released the plaintiff back to work, but at a modified duty status with a lifting restriction of no more than fifteen pounds and minimum bending, squatting and twisting. She prescribed two medications and reminded the plaintiff that he should not use them at work or drive while using them because they cause drowsiness. The plaintiff was to be reevaluated on December 8, 2004.

Congdon called Trudelle from the medical center and informed him that the physician did not think it was necessary to perform a drug test because the plaintiff's behavior was explained by the amount of pain he was suffering. Trudelle told Congdon to instruct the plaintiff to call the center the next morning at nine o'clock to be told when to report for light duty.[9]

At some point after receiving the call from Congdon, Trudelle spoke to Sheahan. Trudelle told Sheahan that a drug test was not administered to the plaintiff. After consultation with Nick Reut, the district labor manager, Sheahan decided that the plaintiff's employment should be terminated for workplace violence. By the time the plaintiff arrived for light duty on December 3, Trudelle and Sheahan, with the assistance of Birch, had finalized a plan for terminating the plaintiff's employment.

On December 3, the plaintiff arrived at the center at approximately 8:20 a.m. to speak with a union representative. He was able to speak briefly with a union representative, Michael Rabbit, until Trudelle told the

[9] Light duty work, or temporary alternate work, is assigned after an employee is injured and cannot do his or her full job.

plaintiff that the union representative had work to do, requested that the plaintiff leave the building and instructed him to call at nine o'clock. The plaintiff waited in his car until nine o'clock when he called Trudelle from the parking lot. Trudelle requested that the plaintiff return at about two o'clock that afternoon in casual clothes for temporary alternate work.

When the plaintiff returned to the center that afternoon, he met in a conference room with Trudelle, Birch and a union representative, John Fitzgerald. The plaintiff was asked initially about November 30, the date of his injury. They then discussed the events of December 2. Trudelle and Birch left the room and determined that Trudelle would ask the plaintiff to submit to a fitness for duty test. When they returned to the room, Trudelle asked the plaintiff to submit to the test, and the plaintiff responded that he would submit to the test. Trudelle and Birch left the room again to confer, and when they returned Trudelle informed the plaintiff that he would not be sent for a fitness for duty test. Trudelle told the plaintiff that his employment was terminated for violating the defendant's policy against workplace violence, in light of the altercation the prior day.

On September 29, 2006, the plaintiff filed a seven count complaint against the defendants, alleging (1) negligent infliction of emotional distress against the defendants, (2) intentional infliction of emotional distress against the defendants, and (3) violations of § 31-51x against the defendants. Counts four and five alleged violations of 42 U.S.C. § 12112 (a) against the defendant. Counts six and seven alleged violations of § 46a-60 (a) (1) against the defendant. The defendants removed the case to federal District Court by notice of removal on October 20, 2006.

On December 5, 2006, the plaintiff filed in the District Court an amended complaint that withdrew his claim

in count three against Trudelle. On December 6, 2006, the defendants filed a motion to dismiss counts one, two, three and seven. The District Court granted the motion with respect to count seven and denied the motion with respect to counts one, two and three. On September 20, 2007, the defendants filed a motion for summary judgment on all remaining counts. The District Court granted the motion with respect to counts four and five, and remanded the remaining counts to the Superior Court.

The defendants thereafter filed in the Superior Court a motion for summary judgment on February 23, 2009, on all remaining counts. The court granted the motion with respect to count two, but denied it as to the remaining counts.

A jury trial commenced on June 29, 2010. After the plaintiff rested on July 6, 2010, the defendants moved for a directed verdict on counts one, three and six. The court heard argument on the matter and reserved a decision. On July 9, 2010, the jury returned a verdict in favor of the plaintiff, answering all twelve interrogatories in the affirmative. The jury awarded the plaintiff $250,000 for negligent infliction of emotional distress as to the defendant, $50,000 for negligent infliction of emotional distress as to Trudelle, $100,000 for a violation of § 31-51x and $100,000 for disability discrimination. Additionally, the jury awarded $500,000 in punitive damages.

Several posttrial motions were filed. On July 19, 2010, the defendants timely moved to set aside the verdict. On the same day, the defendants also moved to set aside the award of punitive damages. The plaintiff moved for back pay, front pay and/or reinstatement at oral argument on July 20, 2010. On July 27, 2010, the plaintiff filed a motion for an award of attorney's fees.

On September 20, 2010, the court awarded the plaintiff back pay in the amount of $47,766.60 for the period of September 2, 2009, to July 20, 2010. The court also ordered that the plaintiff be reinstated, pending a physical examination. On the same date, the court determined that the plaintiff was entitled to recover attorney's fees on the jury awards with respect to the claims against the defendant, as well as the award of back pay. The court concluded that the plaintiff was not entitled to recover attorney's fees on his claim for negligent infliction of emotional distress against Trudelle nor the jury award of statutory punitive damages.

On October 28, 2010, the court, in a written decision, decided the remaining motions. The court denied the defendants' motions to set aside the verdict, denied Trudelle's motion to set aside the verdict or for remittitur, denied the defendant's motion to set aside the verdict or for remittitur and granted the defendant's motion to set aside the award of punitive damages. These appeals followed. Additional facts and procedural history will be set forth as necessary.

I

DIRECT APPEAL

A

The defendant first claims that the court erred in refusing to set aside or direct a verdict on counts one, three and six. Specifically, the defendant claims that (1) the verdict for the plaintiff on count one, negligent infliction of emotional distress, should have been directed or set aside because there was no evidence that the defendants acted unreasonably, (2) the verdict for the plaintiff on count three, § 31-51x, should have been directed in the defendant's favor because the plaintiff did not take a drug test and (3) the verdict for the plaintiff on count six, § 46a-60, should have been

directed in the defendant's favor because the plaintiff was not otherwise qualified, as he could not perform essential job functions.

"Our standards of review for the denial of a motion for a directed verdict and denial of a motion to set aside a verdict are the same." *Hall* v. *Winfrey*, 27 Conn. App. 154, 157, 604 A.2d 1334, cert. denied, 222 Conn. 903, 606 A.2d 1327 (1992). Ordinarily, "[t]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard." (Internal quotation marks omitted.) *Tornaquindici* v. *Keggi*, 94 Conn. App. 828, 833, 894 A.2d 1019 (2006). "[O]ur review of a trial court's refusal to direct a verdict . . . takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. . . . Thus, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because the jury, on the basis of the evidence presented, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case can be applied." (Citations omitted; internal quotation marks omitted.) *Suarez* v. *Sordo*, 43 Conn. App. 756, 759, 685 A.2d 1144 (1996), cert. denied, 240 Conn. 906, 688 A.2d 334 (1997). To the extent that the defendant's claims on appeal present questions of law, our review is plenary. See *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 153, 30 A.3d 703 (applying plenary review where defendants raised questions of law in claim that court improperly

denied their motions to direct the verdict and set aside the verdict), cert. granted on other grounds, 303 Conn. 904, 905, 31 A.2d 1179, 1180 (2011).

1

Count One

The defendant claims that the court erred in denying its motions to direct the verdict and set aside the verdict as to count one, which alleged negligent infliction of emotional distress. It is the defendant's contention that there was insufficient evidence to show that the defendant engaged in conduct that created an unreasonable risk of emotional distress. We disagree.

Our Supreme Court first recognized a cause of action for negligent infliction of emotional distress in *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). Negligent infliction of emotional distress in the employment context arises only where it is "based upon unreasonable conduct of the defendant in the termination process." *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 682, 513 A.2d 66 (1986). "A claim based on the negligent infliction of emotional distress requires . . . that the actor's conduct be unreasonable and create an unreasonable risk of foreseeable emotional harm." *Olson* v. *Bristol-Burlington Health District*, 87 Conn. App. 1, 7, 863 A.2d 748, cert. granted on other grounds, 273 Conn. 914, 870 A.2d 1083 (2005) (appeal withdrawn May 25, 2005). "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 88–89, 700 A.2d 655 (1997).

The defendant claims that the court focused on motive and intent, which are not relevant to a claim for negligent infliction of emotional distress. The defendant argues that such a claim must be based on conduct alone, and that the defendant's conduct during the termination process did not rise to an unreasonable level. In its memorandum of decision denying, inter alia, the defendant's motion to set aside the jury verdict as to count one, the court recounted the evidence presented at trial and determined that there was evidence presented from which the jury reasonably could have determined that the termination process started as early as December 1, 2004. That evidence included the fact that the defendant investigated the scene of the plaintiff's injury on December 1 and appeared pleased to find inconsistencies between the plaintiff's report and the investigation. There was evidence presented that Trudelle made multiple threats to fire the plaintiff on December 2. The court determined that the jury reasonably could have concluded that the defendant's request that the plaintiff take a drug test on December 2 was a scheme concocted to provide just cause for the termination of his employment. Moreover, the jury reasonably could have concluded that the termination of the plaintiff's employment for violation of the workplace violence policy was pretextual, especially when the plaintiff had retracted any statement that he intended to do actual harm to Trudelle and Trudelle testified that he did not feel threatened by the plaintiff. Finally, the jury reasonably could have concluded that the defendant was trying to provoke an additional violation of the workplace violence policy when the plaintiff was asked to submit to a drug test again on December 3. From this evidence presented to the jury, the court concluded that the jury reasonably could have determined that the defendant acted unreasonably during the termination process and that the unreasonable conduct caused injury to the plaintiff.

Viewing the totality of the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have determined that the defendant's conduct in the termination process created an unreasonable risk of emotional distress. While the defendant is certainly correct in its assertion that a claim for negligent infliction of emotional distress must be based on the defendant's conduct, as opposed to its motive or intent, there was sufficient evidence for the jury reasonably to conclude that the defendant's conduct was unreasonable because there was evidence from which the jury could have determined that the manner of the discharge was unreasonable. The court properly denied the defendant's motion for a directed verdict and motion to set aside the verdict.

2

Count Three

The defendant next claims that the court improperly denied its motion to direct the verdict as to count three. It claims that, because the plaintiff did not actually take a urinalysis drug test, the plaintiff did not have a cause of action under § 31-51x as a matter of law.[10] We disagree.

In its memorandum of decision denying the defendant's motion to direct the verdict as to count three, the court determined that there was no dispute that the defendant required the plaintiff, under threat of termination, to submit to a fitness for duty test on December 2, 2004. The court noted that the jury had before it the testimony of the plaintiff that he was required to undergo a urinalysis test or be fired. The

[10] We note that the court instructed the jury that the law does not require that an actual drug test be administered in order to find a violation of § 31-51x. The defendants took exception to this charge, arguing that the fact that there was not a test administered was a failure as a matter of law to make out a claim under § 31-51x.

jury had before it Trudelle's written report, stating that he "was going to have the doctor give [the plaintiff] a substance abuse test" and that he explained to the plaintiff "what would happen if he refused to take the test." The court concluded that "[t]hese facts and inferences reasonably drawn therefrom provide a sufficient foundation for the jury finding that [the defendant] required the plaintiff directly or indirectly to submit to a urinalysis drug test on December 2, 2004, and, further, that [the defendant] did not have a reasonable suspicion to require the plaintiff to submit to a urinalysis drug test."

We reiterate that while ordinarily the proper appellate standard of review when considering a trial court's denial of a motion to set aside a verdict is the abuse of discretion standard, the defendant's claim presents a question of statutory interpretation over which our review is plenary. *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 153.

Section 31-51x (a) provides that "[n]o employer may require an employee to submit to a urinalysis drug test" without reasonable suspicion. The parties focus on the meaning of the phrase, "require an employee to submit," and dispute whether a plaintiff must actually take a urinalysis drug test in order to make out a cause of action under § 31-51x.[11] It is undisputed that the plaintiff

---

[11] Neither this court nor our Supreme Court has addressed the issue of whether actual submission to a urinalysis drug test is a requisite for bringing a claim under § 31-51x. Indeed, the statute has only been considered once by either court. In *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 711 A.2d 688 (1998), our Supreme Court addressed the issue of employees consenting to urinalysis. The court determined that privacy rights of employees under the drug testing statute are analogous to those of government employees under the fourth amendment to the United States constitution. Id., 606–607. Accordingly, an employee can waive his rights under § 31-51x (a) by consenting to the test, just as he can waive his fourth amendment rights. Id., 607. Consent to a urinalysis test under the threat of termination, however, has been found to be involuntary, and not a bar to asserting a violation of § 31-51x. *Doyon* v. *Home Depot U.S.A., Inc.*, 850 F. Sup. 125, 130 (D. Conn. 1994) ("[T]he plaintiff was . . . faced with a choice between discharge or submitting to the drug test. Because this is tantamount to no choice at all, the

in this case did not undergo a urinalysis drug test. The defendant asserts that, to violate the statute, an employer must (1) require the employee to take a urinalysis drug test and (2) the employee must in fact take the urinalysis drug test.[12] The plaintiff argues, essentially, that the phrase must be read as one element, such that liability attaches when an employer requires an employee to be subjected to a test without reasonable suspicion and it is of no significance whether or not the test is actually administered.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 273, 25 A.3d 632 (2011). General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.

We conclude that § 31-51x is plain and unambiguous. Section 31-51x, in plain language, prohibits an employer from requiring an employee to submit to a urinalysis

court finds that the plaintiff did not waive his right to challenge the defendant's drug testing policy by submitting to a drug test under the circumstances presented.").

[12] The defendant does not argue that it falls under the exception of § 31-51x because it had reasonable suspicion to require the plaintiff to submit to a urinalysis drug test. The sole argument is that the plaintiff failed to make out a prima facie case under the statute because he did not take a urinalysis drug test.

drug test without reasonable suspicion. Applying the plain and unambiguous mandate of the statute to the facts of this case, we determine that the defendant required the plaintiff to submit to a urinalysis drug test, and therefore the court properly determined that the plaintiff had a cause of action under § 31-51x.

The plaintiff allowed himself to be subjected to a urinalysis drug test. After two threats of termination for refusing to submit to the test, he eventually agreed to be escorted to a medical clinic by an employee of the defendant. The treating physician performed various field sobriety tests and determined that a urinalysis test was unnecessary. The defendant later asked the plaintiff a second time to submit to a urinalysis drug test, to which he agreed. Trudelle then told the plaintiff that the test would not be necessary. Trudelle testified that part of the reason that he requested this second test could have been to create an additional reason to justify the termination of the plaintiff's employment, had he refused.

It is of no consequence that the treating physician ultimately decided that a urinalysis drug test was unnecessary. The fact of the matter remains that the defendant, through Trudelle, communicated to the plaintiff that he was required to take a drug test or be fired. The plaintiff acquiesced to the request. On these facts, where the plaintiff went to the medical clinic, under threat of termination, to submit to a drug test, provided that his back injury could also be treated, and the next day was again ordered to submit to the test and acquiesced, a cause of action lies under § 31-51x. Accordingly, we conclude that the court properly denied the defendant's motion for a directed verdict.

3

Count Six

The defendant claims that the court improperly denied its motion to direct the verdict as to count six

because the plaintiff failed to establish a prima facie case of disability discrimination under § 46a-60. The defendant contends that the court did not apply precedent holding that the relevant date for determining whether a person is qualified is the date of the adverse employment action, and incorrectly determined that the relevant date was the same as that when the termination process occurred. We agree.

The defendant moved for a directed verdict on count six, asserting that a prima facie case of disability discrimination requires a plaintiff to prove that he was qualified, that is, that he could perform the essential functions of the job with or without a reasonable accommodation.[13] The defendant argued, therefore, that the verdict should be directed for the defendant because the plaintiff was not a qualified individual on December 3, 2004, the date of the disputed adverse employment decision. In its memorandum of decision on the defendant's subsequent motion to set aside the verdict on count six, the court determined that the operative date was in fact December 1, 2004. The court concluded that there was no dispute that on that date the plaintiff was physically capable of performing his job and denied the motion to set aside the verdict as to count six.

We address first the plaintiff's contention that he was not required to prove that he was a qualified individual under what is commonly known as the mixed motive/ *Price Waterhouse* framework.[14] The plaintiff has maintained throughout this litigation that his claim should

[13] The defendant also argued that the evidence was not sufficient to allow the jury reasonably to conclude that the plaintiff was discharged because of his disability. The court rejected that argument and determined that there was sufficient evidence. The defendant does not challenge this portion of the ruling on appeal.

[14] "A mixed-motive case exists when an employment decision is motivated by both legitimate and illegitimate reasons. . . . In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must submit enough evidence that, if

be analyzed under the mixed motive/*Price Waterhouse* framework, while the defendant has argued that it should be analyzed under the pretext/*McDonnell Douglas-Burdine* model.[15] The defendant argued in the alternative that the plaintiff still was required to demonstrate that he was a qualified individual under the *Price Waterhouse* framework. The court heard argument on the issue multiple times during the trial and it further was

believed, could reasonably allow a [fact finder] to conclude that the adverse employment consequences resulted because of an impermissible factor. . . . Under this model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a motivating or substantial role in the employment decision. . . . Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts to the defendant. [T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account." (Citations omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 105–106, 671 A.2d 349 (1996); see also *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion).

[15] "Often, a plaintiff cannot prove directly the reasons that motivated an employment decision. . . . It is in these instances that the *McDonnell Douglas-Burdine* model of analysis must be employed." *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 107, 671 A.2d 349 (1996); see also *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "To establish a prima facie case of discrimination, the complainant must demonstrate that (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination." *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 220, 928 A.2d 586 (2007), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). To be a qualified individual with a disability, a plaintiff must be able to perform the essential functions of his job, with or without a reasonable accommodation, at the time of the adverse employment decision. *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 415, 422 n.19, 944 A.2d 925 (2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant, who bears the burden of production to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the employment action. *Levy* v. *Commission on Human Rights & Opportunities*, supra, 108. If the defendant articulates a legitimate, nondiscriminatory reason, the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reason is pretextual. Id.

addressed by the parties' posttrial motions. The record does not reflect which model the court applied, nor does it reflect if the court reached a conclusion as to whether the plaintiff had to prove that he was a qualified individual to make out a prima facie case under the *Price Waterhouse* framework specifically. Neither party sought an articulation of the court's decision. The finding made by the court that is before us is its conclusion that the plaintiff was a qualified individual on the operative date. We therefore assume, without deciding, that the court required the plaintiff to show that he was a qualified individual at the time of the adverse employment decision so as to make out a prima facie case.

When determining if someone is a qualified individual for the purpose of a disability discrimination claim, the relevant date is the date of the adverse employment decision. *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 422 n.19, 944 A.2d 925 (2008); see also *Adams* v. *Master Carvers of Jamestown, Ltd.*, 91 Fed. Appx. 718, 722 (2d Cir. 2004) ("[t]he date that an adverse employment decision is made is the relevant date for determining whether an individual is qualified under the [Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.]").[16] By contrast, when evaluating a claim of negligent infliction of emotional distress arising in the employment context, the relevant inquiry is whether the employer's conduct was unreasonable during the termination process. *Parsons* v. *United Technologies Corp.*, supra, 243 Conn. 88.

We agree with the defendant that the court applied an incorrect standard when it determined that the operative date was December 1, 2004. During argument on

___

[16] "Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes." *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996).

the defendant's motion for a directed verdict, the court stated in relation to the plaintiff's claim under § 46a-60 that the "termination process" began on the evening of November 30, 2010, and concluded on December 2, 2010. In its memorandum of decision, the court wrote that "[g]iven the circumstances of this case, the court determined that the physical qualifications of the plaintiff to perform the job of package car driver were properly evaluated as of the morning of December 1, 2004." It appears that the court, in stating that the jury could have found that the termination process started as early as December 1, 2004, was referring to the determination made as to count one, the claim of negligent infliction of emotional distress.

We conclude, therefore, that the court abused its discretion in applying the "termination process" standard applicable to claims of negligent infliction of emotional distress to the plaintiff's disability discrimination claim. Absent factual findings as to December 2, 2004, or December 3, 2004, the record is inadequate to ascertain whether the plaintiff would prevail under the correct legal standard. Accordingly, we remand the matter to the trial court to determine the date of the adverse employment decision and whether the plaintiff was qualified at that time.[17] See *Sheridan* v. *Killingly*, 278 Conn. 252, 267, 897 A.2d 90 (2006).

B

The defendant claims that the court improperly denied its September 29, 2010 motion for remittitur on the ground that the jury's monetary awards were excessive. Specifically, the defendant claims that the jury's awards of $300,000 for count one, negligent infliction of emotional distress, and $100,000 for count three,

[17] In so doing the court is not precluded from reconsidering the issue of which analytical framework should be applied and what each framework requires the plaintiff to establish to make out a prima facie case.

a violation of § 31-51x, are excessive and not supported by the evidence.

In denying the defendant's motion to remit or set aside, the court presumed that the jury followed its instructions and the directions on the verdict form. The court concluded that the damage awards, whether considered singly or jointly, did not rise to a level so as to "shock the court's conscience or go beyond what would be just damages."

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Citation omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 281, 32 A.3d 318 (2011).

"[O]ur review of the trial court's decision requires careful balancing." Id., 285. First, "we must retrace the steps of the trial court. That is, we must begin by reviewing the evidence, construed in the light most favorable to sustaining the verdict, just as the trial court was required to do. We then must examine the trial court's decision in such a way that we employ every

reasonable presumption in favor of its correctness."[18] Id. Stated differently, we must examine the evidentiary basis for the jury verdict itself to determine whether the trial court reviewed the verdict in the light most favorable to its correctness. Where the evidence supports the jury's award of damages, a trial court abuses its discretion by ordering remittitur. Id., 282.

## 1

### Count One

We first address the defendant's claim that the court erred by denying its motion to remit as to the $300,000 award for negligent infliction of emotional distress. We disagree.

We begin by reviewing the evidence, construed in the light most favorable to sustaining the verdict. Id., 285. The plaintiff testified before the jury as to his emotional reaction to the defendants' conduct. The plaintiff testified that he was a wreck emotionally following the termination of his employment. He testified that he could not eat or sleep, that he had headaches all day and that he felt that he was miserable to be around. The plaintiff testified that he lost close to forty pounds and was "sickly looking." He testified that he felt lost, confused, angry and embarrassed. The plaintiff likened these feelings to those resulting after a death in the family; there was a part of him missing. He testified to feeling that he had lost his sense of worth and his sense

---

[18] The parties dispute the applicability of *Deas* v. *Diaz*, 121 Conn. App. 826, 998 A.2d 200, cert. denied, 298 Conn. 905, 3 A.3d 69 (2010). The defendants assert that, per *Deas*, our review of a trial court's decision to grant or deny a motion for remittitur is plenary. To the extent that *Deas* may conflict with *Saleh* v. *Ribeiro Trucking, LLC*, supra, 303 Conn. 285, we are bound to apply the precedent of our Supreme Court. See, e.g., *Robert J. Barnabei Contracting, LLC* v. *Greater Hartford Jewish Community Center, Inc.*, 127 Conn. App. 507, 520, 14 A.3d 461 ("[i]t is elemental that this court, as an intermediate appellate body, is bound by the precedent set forth by our Supreme Court"), cert. denied, 301 Conn. 914, 19 A.3d 1260 (2011).

of being. The jury heard that when the plaintiff thinks back on the events surrounding the termination of his employment, he gets very upset. The plaintiff described how much he loved his job, and how his termination affected his interaction with acquaintances, former customers and his community generally. He was embarrassed to tell people that his employment had been terminated.

Our inquiry is whether the trial court reasonably concluded that, viewing the evidence in the light most favorable to sustaining the verdict, the evidence supported the jury's award such that it did not shock the court's conscience. See *Saleh* v. *Ribeiro Trucking, LLC,* supra, 303 Conn. 290. The evidence in the present case, viewed in that light, reveals that the plaintiff suffered emotional distress, with physical manifestations, that continued to the date of his testimony. Employing every reasonable presumption in favor of the correctness of the trial court's decision, we agree with the court's conclusion that the damages awarded do not "shock the . . . conscience or go beyond what would be just damages."

2

Count Three

The defendant claims that, to the extent a cause of action lies; see part I A 2 of this opinion; the court erred in denying its motion to remit as to the jury's award of damages for the violation of § 31-51x, as the award is not supported by the record. We disagree.

The court instructed the jury that, to prevail under § 31-51x, the plaintiff had to prove that the defendant required him to submit to a drug test and did so without reasonable suspicion. The jury determined that the defendant did in fact require the plaintiff to submit to a drug test, and that the defendant did not have

reasonable suspicion to require him to do so, and thereafter awarded damages of $100,000 for this violation of § 31-51x.[19]

The evidence relevant to this claim, construed in the light most favorable to sustaining the verdict, is as follows. The plaintiff testified that when he returned the truck to the center on December 2, he went to Trudelle's office to ask why he was not assigned a helper. Trudelle told the plaintiff that he was acting irrationally and that he would be sent for a fitness for duty test and a substance abuse test. There was not an odor of alcohol on the plaintiff, nor was his speech incoherent or slurred. He was not swaying or otherwise unsteady. When the plaintiff objected to the test, Trudelle told the plaintiff that he would be fired for refusing. After the plaintiff left with the intent of going to the clinic to receive treatment for his back, Trudelle followed him out and told the plaintiff that he would not be allowed to leave the defendant's property and that he needed to go immediately with Trudelle to the clinic. The plaintiff testified to feeling very confused and very upset after he arrived at the clinic.

Our review of the evidence presented at the trial persuades us that the jury's award of $100,000 for a violation of § 31-51x, although generous, nevertheless falls somewhere within the necessarily uncertain limits of fair and reasonable compensation. The award certainly is not so large that it shocks our sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. Accordingly, the court did not abuse its discretion in denying the defendant's motion for remittitur with respect to the jury's award of noneconomic damages.

---

[19] Pursuant to General Statutes § 31-51z (a), any aggrieved person may enforce the provisions of § 31-51x by means of a civil action, and any employer that violated that provision shall be liable to the person aggrieved for special and general damages, together with attorney's fees and costs.

## C

Trudelle claims that the court erred in denying his motion to set aside or for remittitur. Specifically, Trudelle claims that, absent any evidence that he acted outside the scope of his employment, the court erred in refusing to direct or set aside the verdict against him for negligent infliction of emotional distress. We disagree.

The jury was instructed that "[i]n order to prevail on his claim, [the plaintiff] must prove that [the defendant] *and/or* Trudelle engaged in conduct during the termination process that they knew or should have realized would pose an unreasonable risk of causing emotional distress and that such distress, if caused, might result in illness or bodily injury." (Emphasis added.) The court also charged the jury about duplicative damages.[20] While the defendants took exceptions to the jury charge, they did not take exception to any portion of the charge regarding Trudelle's liability.

On September 29, 2010, Trudelle filed a motion to set aside or for remittitur on the ground that the emotional distress damages awarded by the jury against him were duplicative of the emotional distress damages awarded against the defendant. The court denied the motion, concluding that the award against Trudelle personally was not duplicative of the award against the defendant. The court determined that, although the defendant asserted during oral argument of the motion that it, in

---

[20] The court instructed the jury in relevant part: "A basic principle of compensatory damages is that an injury can be compensated only once. If two causes of action provide a legal theory for compensating only one injury, only one recovery may be obtained. Only if the second cause of action entitles the plaintiff to recover for an injury separate from the injury compensated by the award for the first cause of action or at least for an additional component of injury not covered by the first cause of action may additional damages be awarded. Similarly, once an award of damages has been determined for an injury, there may not be additional compensatory damages for the same injury from two or more defendants. You, the jury, must decide what amount reasonably compensates the plaintiff for the injury and which of the defendants are liable for causing such injury."

effect, had ratified the conduct of Trudelle, this claim was not made during the presentation of the case to the jury.[21]

"Our Supreme Court has made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial. . . . This same principle requires parties to raise an objection, if possible, when there is still an opportunity for the trial court to correct the proposed error." (Citation omitted; internal quotation marks omitted.) *Powers* v. *Farricelli*, 43 Conn. App. 475, 478, 683 A.2d 740, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996). Our review of the record reveals that the claim of Trudelle's having acted within the scope of his employment was first raised in his motion to set aside the verdict or for remittitur. Trudelle did not seek to establish, before the jury, that his conduct was ratified by the defendant or that he acted within the scope of his employment. Trudelle did not take exception to the portion of the jury charge expressly telling the jury that it could find both the defendant and Trudelle liable on the claim of negligent infliction of emotional distress, or to the verdict form asking the jury to make separate findings for each defendant.[22] "Unquestionably, it was possible for the [defendant] to object in a timely fashion to allow the trial

[21] The court also reasoned that the jury was charged with assessing the credibility of the witnesses in this case and that the jury may have drawn inferences that Trudelle was "out to get" the plaintiff. The court concluded that it would presume that the jury followed its instruction with regard to nonduplication of damages. Finally, the court noted that the verdict form and jury interrogatories expressly reminded the jury that damages as between Trudelle and the defendant were not to be duplicated.

[22] The following colloquy occurred during argument on the defendants' posttrial motions:

"The Court: Well, you didn't make any objection to submitting the verdict form as against Trudelle because—

"[The Defendants' Counsel]: Well, we did move for a directed verdict. We felt the evidence—

court an opportunity to correct any claimed error in the procedure . . . . Raising that objection as an issue for the first time in a motion to set aside the verdict, obviously does not allow such a possibility because the jury has been excused." Id. Because Trudelle's claim was not properly preserved, we decline to afford it review. See *Barrese* v. *DeFillipo*, 45 Conn. App. 102, 104, 694 A.2d 797 (1997) ("[O]ur review of the record reveals that the defendant first raised the claim of inconsistency in his motion to set aside the verdict. The defendant never undertook to require the plaintiff to choose between negligence and intentional battery and assault, did not except to the jury charge, and, in fact, submitted jury verdict forms and interrogatories based on the plaintiff's allegations of both negligence and intentional tort. Because the defendant's claim was not properly preserved, we decline to review it.").

## D

The defendant also claims that the court improperly awarded the plaintiff attorney's fees on his common-law claim of negligent infliction of emotional distress. We agree.

In February, 2005, the plaintiff entered into a retainer agreement with his counsel under which he agreed that his attorneys would be entitled to one-third of any recovery that the plaintiff received for his wrongful termination claims "and including any claims brought against [his] former employer connected with the manner and facts of [his] termination from employment and the circumstances leading up to and surrounding it." The plaintiff moved for attorney's fees on July 27, 2010.

"The Court: I understood the thrust of that to be there just hasn't been a case made out here, whether it was to Trudelle or [the defendant]. I mean, the question is, I mean, had this come up earlier—and you had said none of Mr. Trudelle's acts are outside the scope of his employment—why do we have a verdict form against him or why is it there. I didn't understand that argument to be made."

In its memorandum of decision granting the plaintiff attorney's fees, the court applied the holding of *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 828 A.2d 64 (2003), and determined that it would award attorney's fees pursuant to the plaintiff's agreement because the agreement, by its terms, was reasonable. The court then addressed the issue of which jury awards would be included in the calculation of attorney's fees. The court determined that the negligent infliction of emotional distress claim was "sufficiently related" to the plaintiff's statutory claims based on the common core of facts at the center of the controversy. In light of the relatedness of the claims and the fact that the plaintiff prevailed on every claim that went before the jury, the court determined that the plaintiff was entitled to attorney's fees on all three counts against the defendant, including the common-law claim of negligent infliction of emotional distress for which there was no statutory basis for an award. The court also determined that the plaintiff was not entitled to attorney's fees on the claim of negligent infliction of emotional distress against Trudelle because the claim was not sufficiently related to the statutory claims against the defendant.

"It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Noel* v. *Ribbits, LLC*, 132 Conn. App. 531, 534–35, 35 A.3d 1078 (2011).

"Connecticut follows the American rule, a general principle under which attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 268–69. In the present case, General Statutes § 31-51z[23] and General Statutes (Rev. to 2003) § 46a-104[24] expressly authorize awards of attorney's fees for claims under §§ 31-51x and 46a-60, respectively. There is no statutory provision authorizing an award of attorney's fees for a common-law claim of negligent infliction of emotional distress.

The court determined that a plaintiff is entitled to an award of attorney's fees on a claim for which there is no statutory basis for the award if the claim is "sufficiently related" to claims for which attorney's fees are authorized by statute. In reaching this conclusion, the court relied on *Hensley* v. *Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), and *Russell* v. *Dean Witter*

[23] General Statutes § 31-51z provides in relevant part: "Any aggrieved person may enforce the provisions of sections 31-51t to 31-51aa, inclusive, by means of a civil action. Any employer . . . that violates any provisions of sections 31-51t to 31-51aa, inclusive . . . shall be liable to the person aggrieved for special and general damages, together with attorney's fees and costs."

[24] General Statutes § 46a-104 provides: "The court may grant a complainant in an action brought in accordance with section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs."

We note that § 46a-104 was repealed by No. 11-237, § 15, of the 2011 Public Acts (effective October 1, 2011), and the following language was substituted in lieu thereof: "The court may grant a complainant in an action brought in accordance with section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs. The amount of attorney's fees allowed shall not be contingent upon the amount of damages requested by or awarded to the complainant."

All references to § 46a-104 in this opinion are to the 2003 revision of the statute.

*Reynolds, Inc.*, 200 Conn. 172, 510 A.2d 972 (1986). *Hensley* specifically addressed the proper standard for setting a fee award where the plaintiff has achieved only limited success but is still the prevailing party. *Hensley* v. *Eckerhart*, supra, 431. The United States Supreme Court determined that, when calculating attorney's fees pursuant to the lodestar method,[25] a trial court does not abuse its discretion in refusing to apportion an award of attorney's fees based on the success or failure of the plaintiff on particular issues where the facts and legal theories are interrelated. Id., 438. Where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief, and the claims involve a common core of facts, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id., 435.

Likewise, *Russell* addressed a situation in which the plaintiff was unsuccessful on some claims and the trial court awarded attorney's fees allocable to those unsuccessful claims. *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 200 Conn. 194. Our Supreme Court determined that, when calculating an award of attorney's fees pursuant to the lodestar method, the award need not be automatically reduced if its recipient fails to prevail on all of his claims at trial. Id. "Where a party succeeds on his [statutory] claim, but fails on other claims brought in the same suit, the size of his award should reflect his success, as determined by the trial court, in securing redress for the injuries that prompted his [statutory] claim and reasonable legal cost incurred in pursuing this success." Id., 195.

---

[25] "The lodestar component of an attorney's fee is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Brookstone Court, LLC*, 107 Conn. App. 340, 341 n.2, 945 A.2d 548, cert. denied, 288 Conn. 907, 953 A.2d 651 (2008).

In the present case, the award of attorney's fees was calculated pursuant to a reasonable contingency fee agreement as opposed to a lodestar calculation, and the plaintiff was successful on all claims tried to the jury. Present in both *Hensley* and *Russell* was the concern that, when calculating an award under the lodestar method, it may be difficult to identify time billed for successful claims versus unsuccessful claims. See *Hensley* v. *Eckerhart*, supra, 461 U.S. 435 ("Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."); *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 200 Conn. 195 ("[b]ecause the amounts [the plaintiff] expended on litigation, including the dollars spent on his unsuccessful claims, were devoted to the pursuit of a goal that he achieved, the trial court permissibly rejected the defendants' demand that it reduce the award by two-fifths"). For these reasons, *Hensley* and *Russell* are inapposite to the present case.

The court calculated the award of attorney's fees pursuant to a reasonable contingency agreement providing for fees of one-third of the plaintiff's recovery. We have not extended the holding of *Russell* to a case where an award was calculated pursuant to a contingency fee agreement, and we decline to do so in the present case. Under these facts, there is no difficulty in determining the appropriate amount for each claim, as in *Russell* and *Hensley*, because the fees were simply one-third of the jury's verdict on each claim. "Because we must respect the legislative prerogative of choosing the special circumstances under which [attorney's fees] awards may be made . . . we require a clear expression of the legislature's intent to create a statutory

exception. To put it simply, when the General Assembly want[s] to authorize the award of attorney's fees it kn[ows] how to do it." (Citation omitted; internal quotation marks omitted.) *Fleming* v. *Garnett*, 231 Conn. 77, 94, 646 A.2d 1308 (1994). In light of the lack of a statutory authorization, we conclude that the court abused its discretion by awarding attorney's fees pursuant to a contingency fee agreement for a common-law claim of negligent infliction of emotional distress.[26]

E

The defendant claims that the court improperly reinstated the plaintiff and awarded back pay. Specifically, the defendant argues that the relief granted was improper because the plaintiff was not able to perform the essential functions of his job for nearly five years subsequent to the termination of his employment, nor did he sufficiently mitigate his damages. We disagree.

The following additional factual and procedural history is relevant to the disposition of this claim. The plaintiff was medically restricted from returning to work from December 2, 2004, to August 13, 2009. In 2007, the plaintiff began working for his brother's company, Engel Construction, as an independent contractor. He worked approximately thirty hours a week and did not receive benefits. The plaintiff was medically

---

[26] We note that we have held, under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., that a court may award attorney's fees for expenses related to the prosecution of a CUTPA claim. General Statutes § 42-110g (d) provides in relevant part that "[i]n any action brought by a person under this section, the court may award . . . costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . ." Although we have held that § 42-110g (d) encompasses attorney's fees for claims related to the prosecution of a CUTPA claim; see *Jacques All Trades Corp.* v. *Brown*, 57 Conn. App. 189, 200, 752 A.2d 1098 (2000); *Heller* v. *D. W. Fish Realty Co.*, 93 Conn. App. 727, 735, 890 A.2d 113 (2006); we decline to hold that § 31-51z and § 46a-104 encompass other claims related to the prosecution of claims under §§ 31-51x and 46a-60.

cleared to return to work on August 13, 2009, and on September 1, 2009, the plaintiff informed the defendant of this development.

Following trial, the plaintiff moved for back pay, front pay, and/or reinstatement at oral argument on July 20, 2010. The defendants filed a brief in opposition on July 27, 2010, to which the plaintiff filed a memorandum of law in response on August 6, 2010. In its memorandum of decision, the court determined that back pay was appropriate in this case in light of the remedial purposes of the statutory scheme. The court first determined that the plaintiff adequately mitigated his damages by obtaining employment with Engel Construction. The court also noted that the plaintiff sought back pay beginning only when he could have physically resumed working for the defendant on September 2, 2009. The court awarded $47,766.60 in back pay, representing the amount that the plaintiff would have earned if he had been employed by the defendant from September 2, 2009, to September 17, 2010, including the commensurate pension fund contributions, reduced by the amount the plaintiff earned during that period from Engel Construction. The court also reinstated the plaintiff, contingent upon the plaintiff's passing a physical examination. The court determined that whatever hostility or animosity existed between the plaintiff and the defendants was insufficient to prevent the plaintiff from returning to work.

Section 46a-104 provides broadly that "[t]he court may grant a complainant . . . such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs." To determine our standard of review for remedies awarded under the provision, we look to General Statutes § 46a-86, which sets

forth the available remedies for discriminatory practices before the commission on human rights and opportunities.[27] See *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 141 n.19, 827 A.2d 659 (2003). "Under our laws prohibiting discrimination in the workplace, a hearing officer must construct a remedy for discriminatory employment practices in order to render a decree that will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future. . . . This remedial goal is furthered by vesting in a hearing officer broad discretion to award reinstatement, back pay or other appropriate remedies specifically tailored to the particular discriminatory practices at issue." (Citations omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 350, 680 A.2d 1261 (1996). Accordingly, we review the remedies awarded by the court pursuant to § 46a-104 for an abuse of discretion as we do remedies awarded by a hearing officer under § 46a-86. Id., 350–51.

The defendant claims that the plaintiff is ineligible for reinstatement or back pay because he was not medically cleared to return to work until August, 2009. The defendant claims that, were it not for how lengthy the litigation in this case was, the plaintiff would not have been able to return to work at the time of trial, and therefore the court's award of back pay and reinstatement was inappropriate.

The defendant's argument is without merit. At the time of the court's award of reinstatement, the plaintiff had been released to work by a physician. Moreover, the

[27] General Statutes §§ 46a-100 through 46a-104 were intended to provide an additional forum for the resolution of discrimination complaints because of increasing delays in the processing of those complaints by the commission. *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 141 n.19, 827 A.2d 659 (2003).

court made reinstatement contingent on the plaintiff's passing an additional physical examination for the job. The court awarded back pay only from the day after the date the plaintiff informed the defendant that he was medically cleared to return to work, and the award was reduced by the amount the plaintiff earned from his interim employment with Engel Construction. The defendants have offered no authority for the proposition that the length of time the plaintiff was unable to work is significant, nor has our research revealed any. We conclude, therefore, that the court did not abuse its discretion by ordering the plaintiff reinstated or by awarding back pay.

## F

The defendant further claims that the court improperly precluded evidence of the parties' workers' compensation settlement. It contends that it did not reinstate the plaintiff in September, 2009, because the parties had settled the plaintiff's workers' compensation claims for $85,000, and it was error for the court to preclude evidence of the settlement. We disagree.

We begin our analysis with the standard of review. "It is well settled that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [Its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset it for a *manifest abuse of discretion*." (Emphasis in original; internal quotation marks omitted.) *White* v. *Westport*, 72 Conn. App. 169, 172, 804 A.2d 1011 (2002).

With this principle in mind, we review the evidence the defendant sought to have admitted. After the plaintiff's discharge, he filed a grievance under the parties'

collective bargaining agreement. In settlement of that grievance, the plaintiff was informed by letter dated May 5, 2006, that he could return to work upon appropriate medical clearance. The letter was admitted into evidence with no objection from the defendants. On July 20, 2006, the defendant agreed to pay the plaintiff $85,000 in full and final settlement of his workers' compensation claims for various injuries the plaintiff suffered while employed by the defendant, and the settlement was approved by the compensation commissioner for the second district. By letter dated August 13, 2009, Stanley G. Pugsley, a physician, authorized the plaintiff to return to work with no restrictions. On June 10, 2010, the plaintiff filed a motion in limine seeking to preclude any and all evidence relating to the settlement between the parties and the defendant's insurer of the plaintiff's prior claims under the Workers' Compensation Act, General Statutes § 31-275 et seq. The court initially reserved decision on the motion and ultimately granted it. The defendant subsequently filed a motion in limine seeking to preclude reference to the Pugsley letter, in which it argued that it was irrelevant that the plaintiff had been found capable of returning to work. The court denied the defendant's motion and allowed the Pugsley letter to come into evidence.[28]

The issue before the court was the relevance of the workers' compensation settlement.[29] The plaintiff argued that it was not probative of the issues in the present case. The defendant claims that it settled with the plaintiff to avoid all future claims and argues that it was harmful error to preclude evidence of the workers' compensation settlement because the defendant should have been allowed to use that evidence as a legitimate,

---

[28] The defendant does not challenge the court's ruling on the admission of the Pugsley letter in this appeal.

[29] The settlement listed various injuries the plaintiff suffered while employed by the defendant but did not include the November 30, 2004 injury.

nondiscriminatory reason why the plaintiff was not reinstated following the Pugsley letter.

The court determined that admission of evidence of the workers' compensation settlement would inject issues that were not relevant or material into the case.[30] The defendant's only argument as to the relevance of the settlement was that it settled the plaintiff's workers' compensation claims with the understanding that he would not return to work and that that was why it did not reinstate the plaintiff following the letter from Pugsley clearing the plaintiff to work. As the court noted several times, nothing in the settlement indicated that the settlement was conditioned on the plaintiff's not returning to work. In light of the wide discretion a trial court has to determine the relevance of evidence, we conclude that the court did not abuse its discretion in precluding evidence of the workers' compensation settlement. See *State* v. *Gaskin*, 116 Conn. App. 739, 744, 977 A.2d 681, cert. denied, 294 Conn. 914, 983 A.2d 851 (2009).

II

CROSS APPEAL

The plaintiff claims on cross appeal that the court erred in calculating the award of attorney's fees.[31] The plaintiff argues that the court should have calculated attorney's fees according to both the plaintiff's contingency agreement and a lodestar model, and that the

---

[30] The plaintiff's physical injury was not before the jury. The court instructed the jury on this matter as follows: "Now, in this case, [the plaintiff] alleges that he suffers from a back injury. Any compensation for that physical injury—the back injury or any emotional distress associated with that back injury—is not before you. The Workers' Compensation Act provides the exclusive remedy for employees who are injured at work."

[31] The plaintiff also raises, in his cross appeal, a claim that the court improperly set aside the award of punitive damages. In light of our remand on the denial of the defendant's motion to direct the verdict on the claim under § 46a-60, we do not reach this claim. See footnote 4 of this opinion.

larger amount of the two should have been awarded. We disagree.

The plaintiff moved for attorney's fees on July 27, 2010. The plaintiff argued to the court that a prevailing plaintiff in a civil rights case should be awarded a fee as calculated under the lodestar analysis or a contingent fee agreement, whichever is greater. In its memorandum of decision granting the plaintiff attorney's fees, the court determined, as a threshold matter, "whether to calculate the award of attorney's fees based on the terms of the plaintiff's contingency fee agreement or based on a lodestar calculation . . . ." The court first determined that the holding of *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 210, applied to the present case and therefore concluded that it would award attorney's fees pursuant to the plaintiff's agreement because the agreement, by its terms, was reasonable. The court then decided which of the jury awards would be included in the calculation, awarding fees for the awards under § 31-51x, § 46a-60 and negligent infliction of the emotional distress as to the defendant, but not as to Trudelle.[32] Additionally, the court determined that the plaintiff was entitled to recover attorney's fees on the award of back pay and the contribution to the pension fund. Ultimately, the court awarded the plaintiff $165,922.20 in attorney's fees and $3729.54 in costs.

We restate the standard of review for a trial court's award of attorney's fees. We review the trial court's decision to award attorney's fees for an abuse of discretion. Our "review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Noel* v. *Ribbits, LLC*, supra, 132 Conn. App. 534–35.

---

[32] See part I D of this opinion.

The plaintiff contends that *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 270, and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 774, 717 A.2d 150 (1998), provide that if a reasonable contingency agreement exists, it must be considered as a baseline for the plaintiff's award but that nothing in either case requires a contingency fee agreement to be a cap on the amount awarded. We disagree.

In *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 774, our Supreme Court determined "the extent to which a reasonable fee agreement should be the basis for a court's award of reasonable attorney's fees." A jury awarded the plaintiff economic and non-economic damages for retaliatory discharge under a statute providing for reasonable attorney's fees for a prevailing plaintiff. Id., 759. The plaintiff had a fee agreement with his counsel providing a fee of one-third of any recovery, under which the fee would have been $48,643,57. Id., 773–74. The trial court, however, awarded $30,000 in fees after concluding that the billing records submitted by the plaintiff did not justify the higher fee. Id., 774. The Supreme Court held that "[a] trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant" and that the trial court therefore abused its discretion in departing downward from a reasonable fee agreement. Id., 776.

In *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 270, a jury awarded the plaintiffs damages pursuant to a statute authorizing reasonable attorney's fees. The plaintiffs' contingency fee agreement provided for fees of one-third of the plaintiffs' recovery, which would have yielded a fee of $4812.10. Id., 267–68. After reviewing the billing records of the plaintiffs' attorneys, the trial court awarded attorney's fees in the amount of $39,750, concluding that "[i]t would be unreasonable

to impose a contingency fee limitation on the reasonable attorney's fee."[33] (Internal quotation marks omitted.) Id., 268.

On appeal, our Supreme Court applied its prior holding from *Sorrentino* and held that "when a contingency fee agreement exists, a two step analysis is required to determine whether a trial court permissibly may depart from it in awarding a reasonable fee pursuant to statute or contract. . . . If the agreement is, by its terms, reasonable, the trial court may depart from its terms only when necessary to prevent substantial unfairness to the party, typically a defendant, who bears the ultimate responsibility for payment of the fee." (Citation omitted; internal quotation marks omitted.) Id., 270–71. The Supreme Court held that the trial court abused its discretion by improperly departing upward from the terms of the contingency fee agreement without first considering the reasonableness of the contingency fee agreement.[34] Id., 272.

*Schoonmaker* stands for the proposition that a trial court abuses its discretion by awarding more attorney's fees than provided for in the contingency fee agreement without first determining that the agreement is unreasonable.[35] Id. In the present case, the court considered, as it was required to by *Schoonmaker* and *Sorrentino*,

---

[33] The plaintiff in the present case asserts the same reasoning advanced by the trial court in *Schoonmaker*, which is that it would be unreasonable to impose a contingency fee limitation on a reasonable attorney's fee. Our Supreme Court rejected that reasoning, concluding that the trial court's concern "violated both the letter and spirit of this court's decision in *Sorrentino* by not giving the existing contingency fee agreement its due regard." *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 272.

[34] The court noted that, to be reasonable, a contingency fee agreement must, at a minimum, comply with subsections (c) and (d) of rule 1.5 of the Rules of Professional Conduct. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 270 n.76.

[35] The plaintiff argues that the court's reading of *Schoonmaker* is directly at odds with our recent decision in *Perez* v. *D & L Tractor Trailer School*, 117 Conn. App. 680, 981 A.2d 497 (2009), cert. denied, 294 Conn. 923, 985 A.2d 1062 (2010). We disagree. In *Perez*, the trial court did not state how

the terms of the contingency fee agreement itself. See id., 270; cf. *Sorrentino* v. *All Seasons Services, Inc.*, supra, 245 Conn. 776. It found the contingency fee agreement to be reasonable by its terms. Therefore, the court was entitled to depart from the terms of the agreement only if necessary to prevent substantial unfairness to the defendant. See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 270–71. The court specifically found that it was "not substantially unfair to the defendants to award attorney's fees pursuant to the contingency fee agreement."[36] We conclude, therefore, that the court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court.

The plaintiff makes an additional policy argument. He argues that in the context of antidiscrimination litigation, a fee calculated pursuant to a contingency fee agreement may not be fair to a plaintiff. Here, as in *Schoonmaker*, the plaintiff's argument "incorrectly confuses adequate compensation for [the plaintiff] with windfall compensation for [plaintiffs'] attorneys." *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 272. As long as the court awards attorney's fees that are sufficient to cover the plaintiff's financial obligations to his attorneys pursuant to their contingency fee agreement, the plaintiff will still be made whole by the award. Our Supreme Court has deemed "disingenuous the notion that a fee award that is disappointing to [a] plaintiff's attorney has any relation to the act of compensating [a] plaintiff himself or herself." Id., 273.

---

it calculated the award, and the plaintiff failed to request an articulation. Because the memorandum of decision was unclear, we could not determine whether the court abused its discretion. Id., 707.

[36] The court based this assessment on the fact that the case had been ongoing for almost four years, requiring extensive work and hundreds of hours of work by the plaintiff's attorneys, and the plaintiff's success on his statutory claims.

The judgment is reversed only as to the award of attorney's fees on the plaintiff's claim of negligent infliction of emotional distress and as to the denial of the defendant's motion to direct the verdict on the plaintiff's claim under § 46a-60 in count six of the complaint, and the case is remanded for further proceedings in accordance with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.