******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

*Syllabus*

Pursuant to statute (§ 21a-408p), no employer may discharge an employee solely on the basis of such employee's status as a person qualified to use medical marijuana under the Palliative Use of Marijuana Act (§ 21a-408 et seq.).

The plaintiff, whose employment as a preschool teaching assistant with the defendant had been terminated, sought to recover damages from the defendant for, inter alia, its alleged discrimination against her because of her disability, epilepsy. At the time of her hire, the plaintiff acknowledged receipt of the defendant's drug free workplace policy and employee handbook, which included provisions stating that working while under the influence of drugs could result in the termination of her employment. She did not inform the defendant that she suffered from epilepsy until after she experienced a seizure while at work. The defendant thereafter adopted a medical alert protocol for the plaintiff, allowed her, in her discretion, to leave work for the day whenever she experienced a seizure, and transferred her to a different classroom to ensure she would be accompanied by another adult at all times for her safety and the safety of the students. In October, 2018, the plaintiff additionally requested that the nurse on site store Valium in her office and administer it to the plaintiff after she had a seizure. The defendant denied this request in part because the nurse was not permitted to administer medications to the staff, but the defendant did not prohibit the plaintiff from bringing Valium and using it in the workplace as needed. In January, 2019, an incident occurred during which the plaintiff called a child the wrong name in front of D, a teacher at the facility, and told D that she was a medical marijuana user and was feeling the effects from it. D reported this interaction to E, the defendant's education manager, and the defendant conducted an investigation into the plaintiff's purported drug use. During the course of the investigation, E and G, the defendant's human resources director, conducted an investigatory interview with the plaintiff, in which the plaintiff admitted that she had reported to work while impaired, which she said was caused by taking too much medical marijuana. As part of its investigation, the defendant also interviewed L, the teacher assigned to the plaintiff's classroom, who noted that the plaintiff had been droopy and unsteady on her feet in the weeks prior to the January, 2019 incident, and the defendant received a letter from B, an employee who stated that the plaintiff had informed him that she was taking medical marijuana. The defendant requested that the plaintiff submit to a drug test, which came back negative for marijuana. The plaintiff additionally submitted a physician's letter to the defendant stating that she was a medical marijuana user with a prescription to use a vape pen daily at 8 p.m. At the conclusion of its investigation, the defendant terminated the plaintiff's employment for reporting to work while impaired by marijuana. In a four count complaint alleging violations of a provision (§ 46a-60 (b) (1)) of the Connecticut Fair Employment Practices Act (§ 46a-51 et seq.), a violation of § 21a-408p, and wrongful termination in violation of a drug testing statute (§ 31-51x), the plaintiff claimed that the defendant had discriminated against her on the basis of her disability and her qualification as a medical marijuana user. The defendant moved for summary judgment, asserting, inter alia, that the plaintiff could not establish a prima facie case of discrimination, it had provided her with reasonable accommodations for her disability, it had a reasonable suspicion that she was impaired in the workplace before it directed her to submit to drug testing, and her discrimination and reasonable accommodation claims were time barred. The court granted the defendant's motion, and the plaintiff appealed to this court. *Held*:

1. The trial court properly rendered summary judgment for the defendant

on the count of the plaintiff's complaint alleging that the defendant violated § 21a-408p (b) (3) by improperly terminating her employment due to her status as a person qualified to use medical marijuana under the Palliative Use of Marijuana Act: no genuine issue of material fact existed as to whether the defendant violated the statute, as its investigation into the plaintiff's January, 2019 conduct originated in D's report that the plaintiff had been impaired in the workplace and was commenced before the plaintiff informed the defendant that she was a qualified user of medical marijuana, thus, the plaintiff could not establish that the defendant discharged her solely on the basis of her status as a qualifying patient; moreover, the defendant's stated decision to terminate the plaintiff's employment for reporting to work in an impaired state was expressly permitted by § 21a-408p (b) (3).

2. The trial court properly rendered summary judgment for the defendant on the count of the plaintiff's complaint alleging discrimination on the basis of disability: the court did not apply an improper legal standard in evaluating that claim, as it explicitly determined that the plaintiff had not met her burden under either the mixed-motive or the pretext model of analysis; moreover, the plaintiff did not raise a genuine issue of material fact as to whether her disability played a substantial role in the defendant's decision to terminate her employment, as notes from the investigatory interview indicated that G specifically asked the plaintiff if she understood that the defendant's alarm over the January, 2019 incident had nothing to do with the plaintiff's epilepsy, to which the plaintiff responded in the affirmative, the written disciplinary notice that the defendant furnished to the plaintiff made no mention of the plaintiff's disability, and the record indicated that the defendant proactively took multiple steps to accommodate the plaintiff's epilepsy once it learned of it; furthermore, the plaintiff could not satisfy her burden to raise a genuine issue of material fact that the real reason for her termination was membership in a protected class, as the defendant stated a legitimate, nondiscriminatory reason for its decision to terminate her employment, and the plaintiff did not submit any evidence to demonstrate or argue on appeal that that reason was pretextual.

3. The trial court properly rendered summary judgment for the defendant on the count of the plaintiff's complaint alleging failure to accommodate her disability in violation of § 46a-60 (b) (1):

a. The plaintiff's claim with respect to the defendant's denial in October, 2018, of her request to store Valium in the nurse's office and have the nurse administer the Valium to her occurred more than 180 days before she filed a complaint of disability discrimination with the Commission on Human Rights and Opportunities in May, 2019, and the plaintiff did not allege that waiver, consent, or another equitable tolling doctrine applied to the accommodation request, thus, the claim with respect to that request was time barred by the statute of limitations ((Rev. to 2017) § 46a-82 (f)).

b. No genuine issue existed as to whether the plaintiff made a medical marijuana accommodation request or whether the defendant violated § 46a-60 (b) (1) by denying such a request: the record did not reflect that the plaintiff requested an accommodation for her medical marijuana use, as she did not disclose her use of medical marijuana to the defendant until after the January, 2019 incident, the letter she furnished from her physician did not request or recommend any accommodations regarding her use of medical marijuana, and she acknowledged during her deposition that there was no reference to medical marijuana in her request for accommodation with respect to her use of Valium; moreover, the plaintiff provided no legal authority to support the proposition that the defendant should have allowed her to use her medical marijuana during the workday or to appear at the preschool facility in an impaired state; furthermore, the plaintiff never suggested that she could properly perform the job of a preschool teaching assistant while impaired by the use of medical marijuana.

4. The trial court properly rendered summary judgment for the defendant on the count of the plaintiff's complaint alleging that the defendant violated § 31-51x by requiring her to take a drug test following the January, 2019 incident; no genuine issue of material fact existed as to whether the defendant had a reasonable suspicion to require the plaintiff to take a drug test, as D and L had provided observations to the defendant of the plaintiff in the workplace that indicated a concern for the safety of the children in the plaintiff's care, B had informed the defendant by

letter that the plaintiff claimed to use medical marijuana, and the plaintiff had admitted to E and G that she used medical marijuana and may have used too much, and a reasonable person armed with that information would have suspected that the plaintiff had been under the influence of drugs in the classroom, which could adversely impact her job performance.

Argued October 19, 2023—officially released March 19, 2024

*Procedural History*

Action to recover damages for, inter alia, alleged employment discrimination, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Reed, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*James V. Sabatini*, for the appellant (plaintiff).

*Tamara M. Nyce*, with whom, on the brief, was *Howard K. Levine*, for the appellee (defendant).

*Opinion*

ELGO, J. The plaintiff, Alyssa Bartolotta, appeals from the summary judgment rendered by the trial court in favor of the defendant, Human Resources Agency of New Britain, Inc., in this employment discrimination action. On appeal, the plaintiff claims that the court improperly concluded that there is no genuine issue as to any material fact and that the defendant was entitled to judgment as a matter of law on all four counts of her complaint. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, viewed in the light most favorable to the plaintiff, and procedural history are relevant to this appeal. The defendant is a nonprofit organization that provides, inter alia, educational services to qualified children. On February 12, 2018, it hired the plaintiff as a teaching assistant in the early childhood division at its 180 Clinton Street location in New Britain (facility).[1] In that capacity, the plaintiff worked in classrooms with approximately twenty preschool children.

At the time of her hire, the defendant provided the plaintiff with a copy of its employee handbook, which contained various policies. Policy 701 sets forth "rules of conduct" and provides in relevant part: "To ensure orderly operations and provide the best possible work environment, [the defendant] expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization. . . . The following . . . infractions of rules of conduct . . . shall result in disciplinary action, up to and including termination . . . . Working under the influence of alcohol or illegal drugs . . . ." Policy 703 pertains specifically to drug and alcohol use and provides in relevant part: "[The defendant] will not tolerate any controlled substance or alcohol use that threatens the health, safety or well-being of its employees, clients or the general public. To ensure worker safety and workplace integrity, this agency strictly prohibits the illegal manufacture, possession, distribution or use of controlled substances or alcohol in the workplace by employees. . . ." Appended to the defendant's motion for summary judgment was the plaintiff's signed employee acknowledgment form, in which the plaintiff acknowledged that she "received the handbook" and that she understood "that it is [her] responsibility to read and comply with the policies contained in this handbook . . . ."

The defendant also signed an acknowledgment of the defendant's drug free workplace policy, which stated in relevant part: "I understand that it is unlawful to manufacture, possess, distribute or use controlled substances or alcohol in the workplace. I have been informed that violations of the Drug Free Workplace Policy will result in disciplinary action up to and including termination." In her deposition testimony, the plain-

tiff admitted that she was aware that her employment could be terminated if she came to work impaired.

The plaintiff has suffered from epilepsy her entire life and experiences, on average, one "bad" seizure a month. She nevertheless did not inform the defendant of that condition until she experienced her first seizure at work.[2] In response, the defendant adopted a medical alert protocol in the spring of 2018 that documented seizure symptoms, protocols, and emergency contacts for the plaintiff. A copy of that protocol, which was titled "Alyssa Bartolotta Medical Alert—Seizure—Partial Complex," was posted on the nurse's desk. The defendant also allowed the plaintiff, in her discretion, to leave for the day whenever she experienced a seizure. In addition, the defendant transferred the plaintiff to a different classroom to ensure that she would be accompanied by a teacher or another teaching assistant at all times, and in the evenings in particular. In her deposition testimony, the plaintiff admitted that this transfer was an accommodation that the defendant provided for her safety, as well as the safety of students.

In October, 2018, the plaintiff provided the defendant with a note from her physician, which requested that the defendant (1) store Valium[3] in the nurse's office and (2) have the nurse administer it to the plaintiff in the event that she had a seizure at work.[4] In her deposition testimony, the plaintiff explained that this note constituted an accommodation request "for the nurse to hold a few doses of Valium locked up somewhere safe, and then for me to lay down for thirty minutes to an hour, rest, and then hop back up and go back to my classroom . . . ."

In a sworn affidavit submitted in support of the defendant's motion for summary judgment, Brenda Sherer, the defendant's Director of Organizational Development and Human Resources, explained that the defendant had a nurse at the facility on only two days each week. Moreover, that nurse was not permitted to administer medications to staff, as such activities exceeded the scope of her employment with the defendant. For that reason, the defendant denied the plaintiff's request in part. At the same time, the defendant, in consultation with the plaintiff, adopted a modified protocol for staff to follow when the plaintiff sustained a seizure at the facility. A copy of that December 5, 2018 protocol was appended to the defendant's motion for summary judgment.[5]

Notably, the plaintiff was not prohibited from using Valium when needed at the facility. At her deposition, the following colloquy occurred between the defendant's counsel and the plaintiff:

"Q. Were you ever told that you could not have your Valium at work?

"A. No.

"Q. You were just told that the nurse could not be the custodian of your Valium; is that right?

"A. Yes. . . .

"Q. So . . . other than [denying the request] to maintain custody of your Valium in the nurse's office, is there anything else that [the defendant] did not accommodate from your request for accommodation?

"A. No."

On January 2, 2019, an incident occurred at the facility between the plaintiff and Amanda Doty, a teacher in the classroom adjacent to the plaintiff's. As Doty averred in her sworn affidavit: "I observed [the plaintiff] call a child by the wrong name. [The plaintiff] told me that she was 'just out of it.' [The plaintiff] then told me that she uses medical marijuana and that her 'head is just not right from it yet.' . . . [Her] comments made me concerned that she was not okay to be in the classroom with the children because she was still feeling the effects of the marijuana." Doty reported the incident to Suzanne Licki, the teacher in the plaintiff's classroom, who advised Doty to notify a supervisor. Doty then informed Ana Erazo, the defendant's Education Manager, of the statements made by the plaintiff that day.

In response, the defendant conducted an investigation into the plaintiff's purported drug use. As Sherer recounted in her affidavit: "On January 8, 2019, [Erazo] and [Human Resources Director] Andrea Goodison met with [the plaintiff] to discuss the report that she was impaired in the workplace. . . . [The plaintiff] admitted that she reported to work impaired and said the cause was taking too much medical marijuana." Copies of the investigation and interview notes were submitted in support of the defendant's motion for summary judgment,[6] which indicate that, during that investigation, the plaintiff for the first time presented her medical marijuana card to the defendant.[7] Those notes also state in relevant part: "When presented with the allegations of what was reported [by Doty] . . . [the plaintiff] did not deny showing up to work impaired [and stated that] 'I use a disposable vape pen which gives [between fifty and seventy] puffs [of medical marijuana]. I wasn't keeping track and I believe the pen ran out. I take it at [8 p.m.]. . . . It is supposed to wear off within [eight] hours and I take it right after I take the Valium and other seizure medication. There is a possibility I may have used too much [and] more than prescribed [because] I ran out and had [two] seizures the following day. I am prescribed [four] puffs at [a] time." In addition, the notes indicate that the plaintiff "did not deny . . . reporting to work impaired and . . . stated, 'It's my mother's fault! I knew I should've said something [about the use of medical marijuana]' . . . ."

The notes also contain the following colloquy

between the plaintiff, Erazo and Goodison:

"[Erazo]: Do you understand that you cannot show up to work impaired because the children require full attention and if you are impaired you are unable to respond quickly to their needs?

"[The Plaintiff]: Yes, I understand, and I thought [the marijuana] would have worn off by then. My mother is [going to] kill me and I'm mad at myself because I knew I should have told you guys. . . . You guys have been so nice and accommodating and I messed up.

"[Goodison]: Do you understand that this has nothing to do with your epilepsy?

"[The Plaintiff]: Yes, I do."

At the conclusion of her interview, the plaintiff was suspended without pay and directed to submit to a drug test. The results from that test, which was administered six days after the January 2, 2019 incident, came back positive for Valium but negative for marijuana.

As part of the investigation, Goodison interviewed Licki, the teacher who worked with the plaintiff on a daily basis. Licki informed her that, for approximately two weeks prior to the January 2, 2019 incident, she observed the plaintiff "to be forgetful, droopy, and unsteady on her feet." Licki at that time expressed concern regarding the safety of children in the plaintiff's care.

The defendant also received a letter from Chris Badenhop, a coworker at the facility, on January 8, 2019. In that letter, Badenhop stated that, during a conversation in a hallway on January 3, 2019, the plaintiff confided in him that "she was on medical marijuana." Badenhop indicated that he assumed the defendant "knew about this already, as [the plaintiff] so openly told me in the hallway, for others to hear. I didn't realize that this was new information, as I wasn't really involved with this staff member or classroom."

The plaintiff subsequently provided the defendant with a letter from her physician dated January 15, 2019. That letter stated in full: "[The plaintiff] has a medical card to use medical marijuana for anxiety and seizures. She uses a vapor at 8PM daily (2–4 puffs). If you have any questions or concerns, please don't hesitate to call."

On January 23, 2019, officials from the defendant's human resources department met with the plaintiff and informed her of the decision to terminate her employment. The written disciplinary notice issued by the defendant states in relevant part that, during the interview on January 8, 2019, the plaintiff "admitted that [she uses] medical marijuana and did show up to work impaired and that [she] may be abusing it. In addition, during multiple phone calls with the [Human Resources] Director, [she] did not deny showing up [to] work impaired." After detailing both Policy 701 and

Policy 703, which are memorialized in the defendant's employee handbook, the notice states that the plaintiff violated "company rules" by reporting to work "impaired as admitted by [the plaintiff] to another staff member. [She] repeated it and never retracted this statement on several occasion[s]." The notice concludes: "[The defendant] has a legal obligation to protect the children in our care. In showing up to work while impaired [the plaintiff] violated the [applicable] standard of care . . . . [The plaintiff] failed to follow company policy and procedures; therefore, [her] employment with [the defendant] is being terminated, effective immediately."

The plaintiff thereafter filed a grievance regarding her termination, which was initially heard by the defendant's grievance committee. After that committee upheld the termination decision, her grievance was heard by the defendant's board of directors. That board, too, concluded that the termination decision was proper.

The plaintiff then filed an employment discrimination complaint with the Commission on Human Rights and Opportunities (commission) on May 29, 2019. In her accompanying affidavit, the plaintiff alleged that the defendant "terminated [her] employment because of her disability" and "failed to accommodate [her] by prohibiting her from working while taking prescription medication for her disability." On April 20, 2020, the commission issued a release of jurisdiction over the plaintiff's complaint.

On July 16, 2020, the plaintiff commenced the present action against the defendant. Her complaint contains four counts and alleges (1) disability discrimination in violation of General Statutes § 46a-60 (b) (1), (2) failure to accommodate, (3) a violation of General Statutes § 21a-408p, and (4) a violation of General Statutes § 31-51x. In response, the defendant filed an answer and several special defenses.

The plaintiff was deposed by the defendant on January 5, 2022. In her deposition testimony, the plaintiff acknowledged that her employment with the defendant could be terminated if she was impaired in the workplace. She nonetheless maintained that she was not impaired when the incident occurred on January 2, 2019, and that taking medical marijuana "does not make [her] impaired." The plaintiff further averred that the results of the drug test conducted on January 8, 2019, "proves [that she] didn't come to work impaired" on January 2, 2019.

On February 25, 2022, the defendant filed a motion for summary judgment. In its accompanying memorandum of law, the defendant argued: (1) the plaintiff could not establish a prima facie case of discrimination; (2) the plaintiff's failure to accommodate claim failed as a

matter of law because the defendant provided the plaintiff with reasonable accommodations for her disability; (3) the plaintiff could not demonstrate that she was terminated because of her status as a qualifying user of medical marijuana; (4) the plaintiff could not establish a violation of § 31-51x because the defendant had a reasonable suspicion that the plaintiff was impaired in the workplace before it directed her to submit to a urine toxicology drug screening; and (5) the plaintiff's discrimination and reasonable accommodation claims were time barred. Appended to that memorandum were several exhibits, including the sworn affidavits of Sherer, Doty, and Licki, certain policies pertaining to drug use contained in the defendant's employee handbook, the medical protocol adopted by the defendant in the spring of 2018 regarding the plaintiff's seizures, the revised medical protocol adopted on December 5, 2018, copies of the defendant's investigation and interview notes related to the January 2, 2019 incident, the written disciplinary notice that the defendant furnished to the plaintiff on January 23, 2019, and portions of the plaintiff's January 5, 2022 deposition testimony.

The plaintiff filed an objection to the motion for summary judgment, as well as a memorandum of law and exhibits that included her January 5, 2022 deposition testimony, the May 28, 2019 affidavit that she filed with the commission, and the January 15, 2019 letter from her physician regarding her use of medical marijuana. The defendant filed a reply to that objection on June 15, 2022.

The court heard argument from the parties on the motion for summary judgment on August 1, 2022. It thereafter issued a memorandum of decision in which it concluded that summary judgment was appropriate on all four counts of the plaintiff's complaint. The court thus rendered judgment in favor of the defendant, and this appeal followed.

At the outset, we note the well established standard that governs our review of a trial court's decision to grant a motion for summary judgment. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . [T]he moving party . . . has the burden of showing the absence of any genuine issue as to all the material facts . . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however,

the [nonmoving] party must present evidence that demonstrates the existence of some disputed factual issue.
. . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary."
(Citations omitted; internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 772–73, 176 A.3d 1 (2018).

I

For purposes of clarity, our analysis begins with the plaintiff's claim that the court improperly rendered summary judgment on the third count of her complaint, which alleges that the defendant violated the Palliative Use of Marijuana Act (act), General Statutes § 21a-408 et seq.[8] More specifically, she alleges that a genuine issue of material fact exists as to whether the defendant violated § 21a-408p (b) (3) by improperly terminating her employment due to her status as a person qualified to use medical marijuana under the act. We disagree.

Section 21a-408p (b) provides in relevant part: "(3) No employer may . . . discharge, penalize or threaten an employee solely on the basis of such person's or employee's status as a qualifying patient . . . . Nothing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours." It is undisputed that, at the time of her termination, the plaintiff was a qualifying patient, as that term is used in the act; see General Statutes §§ 21a-408 and 21a-408p (a) (7); as she submitted a letter from her physician so indicating on January 15, 2019. It also is undisputed that the plaintiff did not disclose that status to the defendant until approximately one week after the January 2, 2019 incident. See footnote 7 of this opinion.

The plain language of § 21a-408p (b) (3) indicates that, to establish a violation thereof, an employer must be shown to have discharged "an employee *solely* on the basis of such person's or employee's status as a qualifying patient . . . ." (Emphasis added.) In the present case, the record belies such a contention. The investigation into the plaintiff's conduct on January 2, 2019, originated in a report from a coworker that the defendant was impaired in the workplace and was commenced *before* the plaintiff ever informed the defendant that she was a qualified patient under the act. The notes from that investigation contain an exchange between Erazo, Goodison, and the plaintiff, in which the plaintiff affirmatively stated her understanding that the investigation had "nothing to do with [her] epilepsy," but rather concerned the dangers posed to children when teaching staff is impaired in the workplace. Moreover, in her deposition testimony, the plaintiff admitted that the defendant's officials did *not* tell her that she could not take medical marijuana to treat her epilepsy, but

rather simply told her that she could not come to work impaired. In addition, the written disciplinary notice issued by the defendant states in relevant part that the plaintiff violated company policy by reporting to work in an impaired state and concluded that her employment was being terminated because she "failed to follow company policy and procedures" regarding drug and alcohol use in the workplace. In light of that record, the plaintiff cannot establish that the defendant discharged her *solely* on the basis of her status as a qualifying patient.

Section 21a-408p (b) (3) also expressly provides that "[n]othing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours." The plain import of that provision confirms that, while the palliative use of marijuana is authorized under Connecticut law, employers nonetheless may prohibit qualifying patients from being under its influence in the workplace.[9] The policies contained in the defendant's employee handbook, as well as its drug free workplace policy that the plaintiff signed upon commencement of her employment, indicate that the defendant prohibited all employees from being under the influence of drugs or alcohol in the workplace. Accordingly, in light of the defendant's stated decision to terminate the plaintiff for reporting to work in an impaired state, we conclude that no genuine issue of material fact exists as to whether the defendant violated § 21a-408p (b) (3).

II

The plaintiff contends that the court improperly rendered summary judgment on the first count of her complaint, which alleges disability discrimination in violation of § 46a-60 (b) (1), a provision of the Connecticut Fair Employment Practices Act (CFEPA), General Statutes § 46a-51 et seq.[10] We do not agree.

A

As a threshold issue, we address the plaintiff's claim that the court applied an improper legal standard in evaluating her disability discrimination claim. She claims that the court improperly applied the *McDonnell Douglas-Burdine* pretext model of analysis; see *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); rather than the mixed-motive model established in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). Our review of that question of law is plenary. See *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214, 192 A.3d 406 (2018) (whether trial court applied proper legal standard is subject to plenary

review on appeal).

"Under the analysis of the disparate treatment theory of liability, there are two general methods to allocate the burdens of proof: (1) the mixed-motive/*Price Waterhouse* model . . . and (2) the pretext/*McDonnell Douglas-Burdine* model." (Citation omitted; footnote omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 104–105, 671 A.2d 349 (1996). Those two methods of proof apply to claims of intentional discrimination. See *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 403, 880 A.2d 151 (2005). "A mixed-motive case exists when an employment decision is motivated by both legitimate and illegitimate reasons. . . . In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must submit enough evidence that, if believed, could reasonably allow a [fact finder] to conclude that the adverse employment consequences resulted because of an impermissible factor." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, supra, 105. "Under [the mixed-motive] model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a 'motivating' or 'substantial' role in the employment decision." Id., 106.

Our Supreme Court further explained that, "[o]ften, a plaintiff cannot prove directly the reasons that motivated an employment decision. Nevertheless, a plaintiff may establish a prima facie case of discrimination through inference by presenting facts [that are] sufficient to remove the most likely bona fide reasons for an employment action . . . . From a showing that an employment decision was not made for legitimate reasons, a fact finder may infer that the decision was made for illegitimate reasons. It is in these instances that the *McDonnell Douglas-Burdine* model of analysis must be employed." (Citation omitted; internal quotation marks omitted.) Id., 107; see also *Jones* v. *Dept. of Children & Families*, 172 Conn. App. 14, 24, 158 A.3d 356 (2017) (describing *McDonnell Douglas-Burdine* standard as " 'pretext' model of analysis"). "The *McDonnell Douglas-Burdine* analysis keeps the doors of the courts open for persons who are unable initially to establish a discriminatory motive. If a plaintiff, however, establishes a . . . prima facie case [under the mixed-motive model of analysis], thereby proving that an impermissible reason motivated a defendant's employment decision, then the *McDonnell Douglas-Burdine* model does not apply . . . ." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 109.

The plaintiff in the present case alleged, inter alia,

that (1) the defendant intentionally discriminated against her and "terminated [her] employment on account of her disability" and (2) the defendant "treated [her] adversely different from similarly situated employees . . . ."[11] Broadly construed; see *Doe* v. *Cochran*, 332 Conn. 325, 333, 210 A.3d 469 (2019); her complaint thus implicates both the mixed-motive and the *McDonnell Douglas-Burdine* pretext models of analysis. In its memorandum of decision, the trial court explicitly concluded that the plaintiff had not offered any proof "that her disability was 'a motivating factor' in the defendant's decision to terminate her" or that "her termination was pretextual." In so doing, the court determined that the plaintiff had not met her burden under either the mixed-motive or the *McDonnell Douglas-Burdine* model of analysis.[12] We, therefore, reject the plaintiff's contention that the court applied an improper legal standard in evaluating her claims of disability discrimination.

B

We next consider whether the court properly applied those legal standards. We begin with the plaintiff's claim that the "defendant terminated [her] because of her disability," which, she argues, entails an application of the mixed-motive model of analysis. Under that model, the plaintiff bears the initial burden of establishing a prima facie case by proving (1) "that he or she is within a protected class"[13] and (2) "that an impermissible factor played a 'motivating' or 'substantial' role in the employment decision."[14] *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 106. "Once the plaintiff has established [her] prima facie case, the burden of production and persuasion shifts to the defendant. [T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account." (Footnote omitted; internal quotation marks omitted.) Id.

A plaintiff's initial burden under the mixed-motive model is not an insignificant one. "[T]he plaintiff's initial burden in a [mixed-motive] case is heavier than the de minimis showing required to establish a prima facie [case under the *McDonnell Douglas-Burdine* pretext model] . . . ." *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997); accord *Tyler* v. *Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.) ("[i]n . . . a 'mixed-motives' case, the plaintiff must initially show more than the 'not onerous' *McDonnell Douglas-Burdine* factors"), cert. denied, 506 U.S. 826, 113 S. Ct. 82, 121 L. Ed. 2d 46 (1992); *Tyler* v. *Bethlehem Steel Corp.*, supra, 1186 (in mixed-motives case, "the defendant need do nothing until the plaintiff has proved unlawful motivation" (internal quotation marks omitted)). A plaintiff in a mixed-motive case bears the "burden of showing that

an illicit motive played a substantial factor in the termination decision . . . ." *Kirk* v. *Hitchcock Clinic*, 261 F.3d 75, 78 (1st Cir. 2001). To satisfy that burden, "a plaintiff must produce a smoking gun or at least a thick cloud of smoke to support [her] allegations of discriminatory treatment." (Internal quotation marks omitted.) *Serby* v. *New York City Dept. of Education*, 526 Fed. Appx. 132, 135 (2d Cir. 2013); see also *Morales* v. *Rooney*, 509 Fed. Appx. 9, 11 (2d Cir. 2013) (plaintiffs in mixed-motive case "were required to adduce evidence that did more than hint at the possibility of unfair treatment on account of [an impermissible factor]" (internal quotation marks omitted)).

The plaintiff in the present case has not met that burden. Nothing in the record before us suggests that the defendant terminated the plaintiff's employment due to her epilepsy. The notes of the January 8, 2019 investigatory interview indicate that the defendant's human resources director specifically asked the plaintiff if she understood that the defendant's alarm over the January 2, 2019 incident "has nothing to do with your epilepsy," to which the plaintiff replied, "Yes I do." The written disciplinary notice that the defendant furnished to the plaintiff likewise makes no mention of her disability generally or epilepsy specifically. Moreover, the record before us demonstrates that, once alerted to the plaintiff's epilepsy following her first seizure at work in the spring of 2018, the defendant proactively took a number of steps to accommodate that disability, as discussed more fully in part III of this opinion. We therefore conclude that the plaintiff has not raised a genuine issue of material fact as to whether her disability played a substantial role in the defendant's decision to terminate her employment.

C

The trial court also concluded that the plaintiff failed to raise a genuine issue of material fact pursuant to the *McDonnell Douglas-Burdine* pretext model of analysis. We concur with that determination.

"[F]or the employee to first make a prima facie case of discrimination [under the *McDonnell Douglas-Burdine* model], the plaintiff must show: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. . . . The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. . . . This burden is one of production, not persuasion; it can involve no credibility assessment. . . . The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision *actually* was motivated by illegal discriminatory bias." (Emphasis added; internal quota-

tion marks omitted.) *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 347 Conn. 241, 257, 297 A.3d 167 (2023); see also *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 515, 43 A.3d 69 (2012) (after defendant articulates nondiscriminatory reason for employment action, "the burden is then on the plaintiff to prove by a preponderance of the evidence that the real reason for the disparate treatment was discrimination on the basis of membership in the protected class"); cf. *St. Mary's Honor Center* v. *Hicks*, 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination" (emphasis in original)).

Assuming, arguendo, that the plaintiff can satisfy all four prongs of her initial burden, she still cannot prevail, as the defendant has stated a legitimate, nondiscriminatory reason for its decision to terminate her employment. It is undisputed that, following an investigation into the January 2, 2019 incident, the defendant concluded that the plaintiff had been impaired at work, in violation of the defendant's policies prohibiting employees from being under the influence of drugs in the workplace. The defendant communicated that nondiscriminatory reason to the plaintiff when it met with her on January 23, 2019, and memorialized it in its written disciplinary notice.[15] Because the defendant proffered a legitimate, nondiscriminatory justification for its decision to terminate the plaintiff's employment, the burden was on the plaintiff to demonstrate that this reason "is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Internal quotation marks omitted.) *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 347 Conn. 257. The plaintiff failed to submit any evidence in that regard and does not argue on appeal that the aforementioned reason was pretextual.[16]

Furthermore, we note that the plaintiff's burden under the final step of the *McDonnell Douglas-Burdine* pretext model "is the same as the plaintiff's initial burden" under the mixed-motive model.[17] *Tyler* v. *Bethlehem Steel Corp.*, supra, 958 F.2d 1185. In part II B of this opinion, we concluded that the plaintiff had not met her initial burden under the mixed-motive model of raising a genuine issue of material fact as to whether her disability played a substantial role in the defendant's decision to terminate her employment. For that reason, she likewise cannot satisfy her burden under the *McDonnell Douglas-Burdine* pretext model to raise a genuine issue of material fact that the real reason for her termination was discrimination on the basis of membership in a protected class. See *Perez-Dickson* v. *Bridgeport*, supra, 304 Conn. 515. We therefore conclude that the court properly rendered summary judgment in favor of the defendant on the plaintiff's claim of disability discrimination.

## III

The plaintiff also claims that the court improperly rendered summary judgment on the second count of her complaint, in which she alleged that the defendant failed to accommodate her disability in violation of § 46a-60 (b) (1). We disagree.

Section 46a-60 (b) (1) requires employers to reasonably accommodate an employee's disability. See *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 415, 944 A.2d 925 (2008). "In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must produce enough evidence for a reasonable jury to find that (1) [she] is disabled within the meaning of the [statute], (2) [she] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff's] disability, did not reasonably accommodate it. . . . If the employee has made such a prima facie showing, the burden shifts to the employer to show that such an accommodation would impose an undue hardship on its business." (Citations omitted; internal quotation marks omitted.) Id., 415–16.

The plaintiff concedes that she did not inform the defendant of her epilepsy disability until she suffered her first seizure at work in the spring of 2018. The undisputed evidence shows that the defendant thereafter proactively implemented a number of accommodations, including adoption of a medical alert protocol titled "Alyssa Bartolotta Medical Alert—Seizure—Partial Complex," which documented seizure symptoms, protocols, and emergency contacts for the plaintiff.[18] The defendant also allowed the plaintiff, in her discretion, to leave for the day whenever she experienced a seizure. In addition, the defendant transferred the plaintiff to a different classroom to ensure that she would be accompanied by a teacher or another teaching assistant at all times, and evenings in particular. In her deposition testimony, the plaintiff admitted that this transfer was an accommodation that the defendant provided for her safety, as well as the safety of students. Those accommodations undoubtedly were reasonable measures taken by the defendant upon learning of the plaintiff's disability, and the plaintiff has not argued otherwise in this appeal.

Instead, she alleges that the defendant improperly denied two distinct requests for accommodation purportedly made by the plaintiff on October 8, 2018, and January 15, 2019, respectively. We address each in turn.

## A

We begin with the plaintiff's contention that the defendant improperly denied her request for an accommodation on October 8, 2018. At that time, the plaintiff provided the defendant with a note from her physician,

which requested that the defendant (1) store Valium in the nurse's office and (2) have the nurse administer it to the plaintiff in the event that she had a seizure at work.[19] In her deposition testimony, the plaintiff explained that this note constituted an accommodation request "for the nurse to hold a few doses of Valium locked up somewhere safe, and then for me to lay down for [thirty] minutes to an hour, rest, and then hop back up and go back to my classroom . . . ."

In a sworn affidavit submitted in support of the defendant's motion for summary judgment, Sherer explained that the defendant had a nurse at the facility only two days each week. Moreover, that nurse was not permitted to administer medications to staff, as such activities exceeded the scope of her employment with the defendant. For that reason, the defendant denied the plaintiff's request in part. At the same time, the defendant did not prohibit the plaintiff from having Valium at the facility, as the plaintiff conceded in her deposition testimony.[20] Rather, the defendant simply denied the plaintiff's request to have the part-time nurse serve as the custodian thereof.

On appeal, the plaintiff maintains that the defendant's denial of her October 8, 2018 accommodation request violated her rights under § 46a-60 (b) (1). In response, the defendant argues, inter alia, that this claim is time barred, as the conduct in question occurred outside the 180 day limitation period contained in General Statutes (Rev. to 2017) § 46a-82 (f).[21] We agree with the defendant.

Pursuant to § 46a-82 (f), any person claiming to be aggrieved by an alleged discriminatory practice is required to file a complaint with the commission "within one hundred and eighty days after the alleged act of discrimination . . . ." As our Supreme Court has held, compliance with that time limit is mandatory unless "waiver, consent, or some other compelling equitable tolling doctrine applies." *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 284, 777 A.2d 645 (2001). In the present case, the plaintiff filed her complaint with the commission on May 29, 2019. Any allegation of a discriminatory practice that occurred prior to November 30, 2018, therefore, is barred by that statute of limitations.

It is undisputed that both the plaintiff's request for an accommodation to store Valium at the facility and the defendant's response thereto occurred in October, 2018. Moreover, the plaintiff has not alleged that waiver, consent, or some other compelling equitable tolling doctrine applies to that accommodation request. Accordingly, her claim with respect to that request is barred by the statute of limitations contained in § 46a-82 (f).

B

The plaintiff also claims that the defendant improp-

erly denied what she refers to in her appellate brief as her "medical marijuana accommodation request." We do not agree.

First and foremost, the plaintiff has presented no evidence that she made such a request of the defendant. As she acknowledged in her complaint and deposition testimony, she did not disclose her use of medical marijuana to the defendant until January 8, 2019. See footnote 7 of this opinion. Although she furnished a letter from her physician on January 15, 2019, the physician did not recommend or request that the defendant provide any accommodations to the plaintiff. Rather, the physician simply stated: "[The plaintiff] has a medical card to use medical marijuana for anxiety and seizures. She uses a vapor at 8PM daily (2–4 puffs). If you have any questions or concerns, please don't hesitate to call." Furthermore, the plaintiff was asked during her deposition "[w]here in [her] request for accommodation is there any reference at all to medical marijuana," to which she replied: "There isn't." The plaintiff also was asked if "there [was] anything else other than [denying the request] to maintain custody of your Valium in the nurse's office, is there anything else that we did not accommodate from your request for accommodation?" The plaintiff answered, "No." On the record before us, we cannot conclude that the plaintiff requested an accommodation for her medical marijuana use.

In addition, it is unclear what—if any—accommodation the defendant could make with respect to the plaintiff's use of medical marijuana short of allowing her to appear impaired in the workplace. The plaintiff's medical marijuana prescription called for her to take between two and four "puffs" of medical marijuana every day at 8 p.m. In her deposition testimony, the plaintiff explained that, when she took the medication as directed, she would not become impaired and that she would never depart from those directions.

To the extent that the plaintiff is suggesting that the defendant should permit her to disregard the directions on her medical marijuana prescription to allow her (1) to use it during the workday or (2) to appear at the facility in an impaired state, she has provided no legal authority that supports that bold proposition. In this regard, we reiterate that the act expressly provides that "[n]othing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours." General Statutes § 21a-408p (b) (3).

The sole case relied on by the plaintiff is *Stewart* v. *Snohomish County PUD No. 1*, 262 F. Supp. 3d 1089 (W.D. Wn. 2017), aff'd, 752 Fed. Appx. 444 (9th Cir. 2018), a federal case applying the state law of Washington. In her appellate brief, the plaintiff notes that "the

trial court's decision makes no mention of the *Stewart* case." For three reasons, that silence is understandable.

First, because *Stewart* involves the proper application of Washington state law, it is both inapposite and nonbinding authority. Second, that case is factually distinct from the present case in several respects. *Stewart* involved a plaintiff who took prescription medication *during* the workday to treat an existing disability and whose physician provided a letter to the defendant employer explaining that the plaintiff was " 'able to work without restrictions' " after the medication was administered. Id., 1094, 1097. By contrast, the plaintiff here was not directed to take medical marijuana during the workday, but rather was prescribed to take it at 8 p.m. each day. Moreover, unlike the plaintiff in *Stewart*, the plaintiff in the present case did not inform her employer that she was under such treatment and did not provide any communication from her treating physician indicating that she could work without restriction after taking medical marijuana during the day. In addition, the plaintiff in *Stewart*, who worked as a customer service representative at a utility company; id., 1093; performed markedly different duties. Whereas the plaintiff in *Stewart* primarily assisted "customers in person or over the phone with issues with their public utility services and billing"; id.; the plaintiff here was entrusted with the care of approximately twenty preschool children in a classroom setting. Indeed, her employment as a teaching assistant required satisfaction of certain statutory prerequisites, which speaks to the gravity of her position. See, e.g., *Friedenberg* v. *School Board of Palm Beach County*, 911 F.3d 1084, 1098 (11th Cir. 2018) ("[O]ur schools have a singular custodial and tutelary responsibility for our nation's most precious resource—our children. . . . Our teachers . . . are directly given the responsibility to ensure the safety and protection of our children. Each family sending a child into the care and custody of [a school] is counting on [its] teachers not only to educate them, but to keep them safe. It is to them that we look to safeguard the classroom and protect our students.").

Third, and perhaps most significantly, the District Court in *Stewart* found that, although the plaintiff in that case had "exhibited signs of impairment at work"; *Stewart* v. *Snohomish County PUD No. 1*, supra, 262 F. Supp. 3d 1096; the defendant had not shown that "the effects of [her] medication . . . prevented her from properly performing her job" as a customer service representative. Id., 1104. In the present case, the plaintiff never has suggested that she can properly perform her job as a preschool teaching assistant while impaired by the use of medical marijuana.

In light of the foregoing, we conclude that no genuine issue of material fact exists as to whether the plaintiff made a medical marijuana accommodation request or

whether the defendant violated § 46a-60 (b) (1) by denying such a request. The court, therefore, properly rendered summary judgment on the second count of the plaintiff's complaint.

IV

As a final matter, the plaintiff claims that the court improperly concluded that no genuine issue of material fact exists as to whether the defendant violated § 31-51x by requiring her to take a drug test on January 8, 2019. She contends that the defendant lacked a reasonable suspicion to do so. We disagree.

Section 31-51x provides in relevant part: "(a) No employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance. . . ." That statute, "in plain language, prohibits an employer from requiring an employee to submit to a urinalysis drug test without reasonable suspicion." *Tomick* v. *United Parcel Service, Inc.*, 135 Conn. App. 589, 608–609, 43 A.3d 722, cert. denied, 305 Conn. 920, 47 A.3d 389 (2012).

Neither the General Statutes nor any state regulation defines the term "reasonable suspicion" as it is used in § 31-51x. In *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 606, 711 A.2d 688 (1998), our Supreme Court explained that § 31-51x "was enacted as part of a comprehensive legislative plan regulating workplace drug testing" and "was intended to provide the same protections to private employees in Connecticut as those protections that are afforded to employees of the federal government by the fourth amendment to the United States constitution." The court further opined that "the issue of voluntary consent to drug testing under § 31-51x should be resolved in a manner consistent with federal fourth amendment constitutional law." Id., 606–607. In his concurring opinion, Justice McDonald emphasized that, under established fourth amendment jurisprudence, "[r]easonable suspicion is a lesser standard . . . than probable cause. . . . The collective knowledge of the employer should determine reasonable suspicion for the drug testing." (Citations omitted; internal quotation marks omitted.) Id., 619 (*McDonald, J.*, concurring).

Guided by that precedent, it is appropriate to look to the criminal context in ascertaining the applicable standard for reasonable suspicion. In that context, our Supreme Court has observed that "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content [from] that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause. . . . Reasonable and articulable suspi-

cion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . [I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 333 Conn. 543, 569, 217 A.3d 576 (2019).

In her appellate brief, the plaintiff submits that "[i]t is undisputed that the defendant lacked reasonable suspicion on January 8, the day it ordered the plaintiff to submit to drug testing." We disagree.

Prior to January 8, 2019, the defendant had no knowledge of the plaintiff's medical marijuana use. Shortly after the January 2, 2019 incident transpired, Doty notified Licki and Erazo of her concern that the plaintiff "was not okay to be in the classroom with the children because she was still feeling the effects of the marijuana." In response, the defendant opened an investigation into the allegations of drug use by the plaintiff. As part of that investigation, Goodison interviewed Licki, the teacher who worked with the plaintiff on a daily basis. Licki informed her that, for approximately two weeks prior to the January 2, 2019 incident, she observed the plaintiff "to be forgetful, droopy, and unsteady on her feet." Licki at that time expressed concern regarding the safety of children in the plaintiff's care. The defendant also received a letter from Badenhop, who stated that, on January 3, 2019, the plaintiff told him that "she was on medical marijuana."

On January 8, 2019, Goodison and Erazo met with the plaintiff to discuss the report that she was impaired in the workplace. At that time, the plaintiff for the first time notified the defendant that she used medical marijuana. Moreover, as Sherer noted in her affidavit, "[d]uring [that] interview . . . [the plaintiff] admitted that she reported to work impaired and said the cause was taking too much medical marijuana." The notes of that interview similarly state in relevant part: "When presented with the allegations of what was reported [by Doty] . . . [the plaintiff] did not deny showing up to work impaired and stated: 'I use a disposable vape pen which gives [between fifty and seventy] puffs [of medical marijuana]. I wasn't keeping track and I believe the pen ran out. I take it at [8 p.m.]. . . . It is supposed to wear off within [eight] hours and I take it right after I take the Valium and other seizure medication. There is a possibility I may have used too much [and] more than prescribed [because] I ran out and had [two] seizures the following day. I am prescribed [four] puffs at [a] time.'"

The interview notes also contain the following collo-

quy between the plaintiff and Erazo:

"[Erazo]: Do you understand that you cannot show up to work impaired because the children require full attention and if you are impaired you are unable to respond quickly to their needs?

"[The Plaintiff]: Yes, I understand, and I thought [the marijuana] would have worn off by then. My mother is [going to] kill me and I'm mad at myself because I knew I should have told you guys. . . . You guys have been so nice and accommodating and I messed up."

In light of (1) the observations of the plaintiff in the preschool workplace by Doty and Licki, (2) the letter from Badenhop, (3) the plaintiff's disclosure during the investigatory interview that she used medical marijuana, (4) the plaintiff's admission during that interview that she reported to work impaired, (5) the plaintiff's statement that she may have taken too much medical marijuana prior to the January 2, 2019 incident, and (6) her statement that she "messed up," we agree with the trial court that no genuine issue of material fact exists as to whether the defendant had a reasonable suspicion to require the plaintiff to take a drug test following her investigatory interview on January 8, 2019. A reasonable person armed with that information would suspect that the plaintiff was under the influence of drugs in the classroom, which could adversely affect her job performance. The court, therefore, properly rendered judgment on the fourth count of the plaintiff's complaint.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] It is undisputed that the plaintiff met the statutory requirements for that position.

[2] During her deposition, the plaintiff testified that the defendant conducted an interview with her prior to extending an offer of employment. She further testified that, at that time, she did not apprise the defendant of the fact that she had epilepsy.

[3] Valium, known also as diazepam; see *State* v. *Ruscoe*, 119 Conn. App. 834, 837, 989 A.2d 667, cert. denied, 296 Conn. 903, 992 A.2d 330 (2010); is a controlled substance under Connecticut law. See General Statutes § 21a-240 (9); Regs., Conn. State Agencies § 21a-243-10 (a) (15).

[4] That note contained a list of the plaintiff's medications. The plaintiff's physician then stated that, if the plaintiff "were to have a seizure at work, please send her to the nurse's office. The nurse can administer the Valium."

[5] That protocol was titled "Protocol to follow when staff has a seizure" and stated: "Protocol: Classroom staff will place [the plaintiff] in a safe place in the classroom. Classroom staff will call Health Manager, [Education and Family Services Manager], Assistant Director or Director to let us know [that the plaintiff] had a seizure. In the event that no one can be found classroom staff will call Chuc [at extension] 2235 and she will find someone to help. [They then] will go to the classroom and check on [the plaintiff]. [The plaintiff] will determine if she wants to stay or go home. In the event that [the plaintiff] decides to go home a manager will call the emergency contacts that staff provided to us. Always calling first [the plaintiff's mother]."

[6] In her affidavit, Scherer averred that exhibit A-7 submitted by the defendant was "a true and accurate copy of the investigation and interview notes that were prepared in connection with [the defendant's] investigation."

[7] It is undisputed that the plaintiff did not inform the defendant of her medical marijuana use until the investigation into the January 2, 2019 incident commenced, as she admitted in her deposition testimony. In her complaint,

she likewise acknowledged that, "[o]n January 8, 2019, the plaintiff notified the defendant that she takes prescribed medical marijuana and showed her state medical card to the defendant."

[8] Although the act has been amended by the legislature since the events underlying this appeal; see, e.g., Public Acts, Spec. Sess., June, 2021, No. 21-1, § 77; those amendments have no bearing on the merits of this appeal. We therefore refer to the current revision of the act in this opinion.

[9] In her appellate brief, the plaintiff argues, with respect to her use of medical marijuana, that "[t]erminating an employee for using medication for a disability is the equivalent of terminating an employee because of her disability." She has provided no legal authority for that bald assertion, which runs contrary to the plain language of § 21a-408p (b) (3).

[10] General Statutes § 46a-60 provides in relevant part: "(b) It shall be a discriminatory practice in violation of this section . . . (1) For an employer . . . to discharge from employment any individual or to discriminate against any individual . . . because of the individual's . . . present or past history of mental disability, intellectual disability, learning disability, physical disability . . . ."

Under CFEPA, " '[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy . . . ." General Statutes § 46a-51 (15).

[11] In her complaint, the plaintiff defined her disability as chronic epilepsy.

[12] To the extent that the plaintiff complains that the trial court's discussion of those respective models of analysis was not exhaustive enough, we note that she did not seek an articulation of the court's judgment in any respect. See Practice Book § 66-5; see also *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 739 n.25, 937 A.2d 656 (2007) ("in the absence of an articulation . . . [an appellate court will] presume that the trial court acted properly").

[13] It is undisputed that the plaintiff is within a protected class under CFEPA due to her physical disability. See footnote 10 of this opinion.

[14] At times, the decisional law of this state has reflected a dichotomy with respect to the evidentiary framework involved in the mixed-motive and the *McDonnell Douglas-Burdine* pretext models of analysis. See, e.g., *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 277, 25 A.3d 632 (2011) (*Price Waterhouse* mixed-motive standard applies "where there is direct evidence of discrimination" (internal quotation marks omitted)); *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 425, 944 A.2d 925 (2008) (describing *McDonnell Douglas-Burdine* model as "circumstantial evidence [framework]"); *Jacobs* v. *General Electric Co.*, supra, 275 Conn. 401 ("[e]mployment discrimination . . . can be proven either directly, with evidence that the employer was motivated by a discriminatory reason, or indirectly, by proving that the reason given by the employer was pretextual"). Our Supreme Court nonetheless has instructed that a plaintiff's burden under the mixed-motive model may be established "through direct . . . or circumstantial evidence . . . ." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 105.

As the United States Court of Appeals for the Second Circuit observed, "we [previously] have equated direct evidence with evidence that shows that the impermissible criterion played some part in the decision-making process. . . . [The defendant] would have us define direct evidence as noncircumstantial evidence. But the basic problem with this touchstone is that direct evidence of intent cannot exist, at least in the sense of evidence which, if believed, would establish the ultimate issue of intent to discriminate. . . . Normally, direct evidence is described as evidence tending to show, without resort to inference, the existence of a fact in question. This is often contrasted with circumstantial, or indirect evidence, which requires the factfinder to take certain inferential steps before the fact in question is proved. But . . . all knowledge is inferential." (Citations omitted; internal quotation marks omitted.) *Tyler* v. *Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir.), cert. denied, 506 U.S. 826, 113 S. Ct. 82, 121 L. Ed. 2d 46 (1992). The court continued: "Direct evidence, it seems, is an unfortunate choice of terminology for the sort of proof needed to establish a mixed-motives case. Direct and indirect describe not the quality of the evidence presented, but the manner in which the plaintiff proves his case. Strictly speaking, the only direct evidence that a decision was made because of an impermissible factor would be an admission by the decisionmaker such as I fired him because he was too old. Even a highly-probative statement like You're fired, old man still requires the factfinder to draw the inference that the plaintiff's age had

a causal relationship to the decision. But juries have always been allowed to draw such inferences." (Internal quotation marks omitted.) Id., 1185. The court thus clarified that the mixed-motive model of analysis "does not require . . . direct evidence of discriminatory animus (at least not in the sense of direct and circumstantial evidence). What *is* required is simply that the plaintiff submit enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were because of an impermissible factor." (Emphasis in original; internal quotation marks omitted.) Id., 1187.

[15] In that written disciplinary notice, the defendant stated in relevant part that, during the interview on January 8, 2019, the plaintiff "admitted that [she uses] medical marijuana and did show up to work impaired and that [she] may be abusing it. In addition, during multiple phone calls with the [Human Resources] Director, [she] did not deny showing up to work impaired." That notice further stated that the plaintiff violated "company rules" by reporting to work "impaired as [she] admitted . . . to another staff member" and then concluded: "In showing up to work while impaired [the plaintiff] violated the [applicable] standard of care . . . . [The plaintiff] failed to follow company policy and procedures; therefore, [her] employment with [the defendant] is being terminated, effective immediately."

[16] In her appellate brief, the plaintiff does not refute the court's conclusion that she failed to offer any proof that the defendant's stated rational for terminating her employment was pretextual and insists that "[t]his is not a pretext case."

[17] Under the mixed-motive model of analysis, the plaintiff's initial burden requires proof "that an illicit motive played a substantial factor in the [employment] decision . . . ." *Kirk* v. *Hitchcock Clinic*, supra, 261 F.3d 78. Under the final step of the *McDonnell Douglas-Burdine* pretext model, the plaintiff's burden in opposing a defendant's motion for summary judgment is to present evidence that the employment decision "actually was motivated by illegal discriminatory bias." (Internal quotation marks omitted.) *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, supra, 347 Conn. 257.

[18] A copy of that protocol was posted on the nurse's desk "so that staff knew who to contact and how to respond when [the plaintiff] had a seizure" in the workplace.

[19] The record before us does not contain a copy of that note from the plaintiff's physician. It nevertheless is undisputed that the plaintiff submitted that note to the defendant on October 8, 2018, as the defendant admitted in its answer to the plaintiff's complaint. Moreover, in support of its motion for summary judgment, the defendant furnished a report dated October 15, 2018, from Erazo to Goodison regarding the note that the defendant received from the plaintiff's physician, which states in relevant part: "[The] note includ[ed] a list of the plaintiff's medications. The note stated that if the plaintiff 'were to have a seizure at work, please send her to the nurse's office. The nurse can administer the Valium. Please allow her to rest in the nurse's office for [thirty to sixty] minutes.' "

[20] In her deposition testimony, the plaintiff stated that Erazo instructed her to keep her Valium in her purse while at the facility and admitted that she was never told that she could not have her Valium at work.

[21] All references to § 46a-82 (f) in this opinion are to the 2017 revision of that statute, which the defendant pleaded as a special defense. In moving for summary judgment on the plaintiff's failure to accommodate claim, the defendant alternatively argued that her claim was time barred and that it failed on its merits and has renewed both arguments in its appellate brief in this appeal.